Valerie Isabelle **WAUCHOPE**, Plaintiff,

v.

**U.S. DEPARTMENT OF STATE and Secretary of State, James Baker, Defendants.**

No. C–90–0897 RFP.

United States District Court, N.D. California.

Jan. 31, 1991.

Susana Igleheart, Thomas P. Byrne, James M. Byrne, Byrne, Igleheart, Kerosky & Byrne, San Francisco, Cal., for plaintiff.

Mark C. Walters, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, D.C., Susan L. Kamlet, Asst. U.S. Atty., U.S. Attys. Office, San Francisco, Cal., for defendants.

## ORDER

PECKHAM, District Judge.

### I. INTRODUCTION

Prior to 1934, the citizenship laws of the United States had this effect:

[S]uppose that a United States sister and brother both marry abroad, as many do, and that each has a family of children by marriage. The brother, in either peace or war time, may pick up his children and bring the family into the United States

as American citizens. The sister cannot do this.

S.Rep. No. 865, 73d Cong., 2d Sess. 2 (1934). In 1934, the citizenship laws were amended to eliminate this discrimination.

This case concerns the continuing discriminatory effect of that statute. The statute, Section 1993 of the Revised Statutes of 1874, granted citizenship to the foreign-born offspring of male American citizens but denied citizenship to the foreign-born offspring of female American citizens.

Plaintiff, whose mother was a United States citizen, was born in Canada. Defendants have denied plaintiff a United States passport on the ground that, according to the statute, she is not a United States citizen. She argues that Section 1993, which conditions the grant of citizenship on the gender of the citizen-parent, violates the constitutional guarantee of equal protection. In an earlier case, *Elias v. U.S. Dep't of State*, 721 F.Supp. 243 (N.D.Cal. 1989), this court found the statute unconstitutional on identical grounds. The instant case was referred to this court as a related matter under Local Rule 205–2.

There is no dispute as to the facts. Defendant has filed a motion to dismiss; plaintiff has filed a cross-motion for summary judgment.

## II. BACKGROUND

Plaintiff's mother, Nora Greenaway Hunter, was born a United States citizen in New York in 1904. Plaintiff's mother married Frederick Hunter, a Canadian citizen, in 1929. The plaintiff was born in Canada in 1931. Plaintiff's mother died in the late 1950's.

On October 31, 1989, shortly after this court's ruling in *Elias*, plaintiff applied for a United States passport. The State Department denied her request on the ground that she is not a United States citizen under the terms of Section 1993. Section 1993 provides that

[a]ll children heretofore born or thereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth

citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

Because plaintiff's father was not a citizen—although her mother *was* a citizen— the Department concluded that she had no rights under § 1993. Plaintiff exhausted her administrative remedies and commenced this action. She challenges § 1993 under the equal protection component of the Due Process Clause of the Fifth Amendment.

## III. DISCUSSION

Defendant's motion to dismiss is based on four separate grounds: (1) that plaintiff lacks standing; (2) that plaintiff's claim is barred by laches; (3) that Section 1993 satisfies the "facially legitimate or bona fide reason" test for citizenship legislation by decreasing the incidence of dual citizenship; and (4) that the courts lack power to grant citizenship even if the statute is found unconstitutional.

Plaintiff's cross-motion for summary judgment is based on her contention that this case is controlled by *Elias*—either because the government is barred under collateral estoppel or because the government has raised no arguments that were not already decided in that case.

Before we address the above arguments, it will be useful to explore the role of our earlier decision in *Elias* in the current litigation.

### A. *The Elias Decision*

The facts in *Elias* are quite similar to the facts presented here. In *Elias*, plaintiff's mother, an American citizen, moved to Canada and married a Canadian citizen. Plaintiff was then born in Canada to an American mother and a Canadian father. Plaintiff's application for a United States passport was denied, and she subsequently filed suit in this court alleging that the Department's interpretation of § 1993 was in violation of her right to equal protection under the laws. In the opinion, we analyzed sev-

eral of the arguments now offered by the government. At that time, however, the government did not offer *any* reason, let alone a "facially legitimate or bona fide" one, to justify § 1993. *Elias*, 721 F.Supp. at 249 ("[i]n the instant situation, the government has offered no rationale at all").

■ Plaintiff urges us to apply collateral estoppel and res judicata to bar the government from re-litigating the issues in *Elias*. Plaintiff concedes that offensive non-mutual collateral estoppel may not be used by private litigants against the government, *see, e.g., United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), but asserts that her use of estoppel principles ought not to be deemed "non-mutual" because she was a party to the prior action. It is quite clear, however, that Ms. Wauchope was not a party to *Elias;* she was neither named in the complaint nor was a class ever certified. The final order directed relief only for Ms. Elias herself. Consequently, this case will not be controlled by *Elias*, although that decision is persuasive on many of the disputed issues we face.

In addition, the government raises several arguments not presented in the earlier case. Those will be addressed for the first time here.

### B. *Plaintiff's Standing to Assert Her Mother's Claims*

■ Plaintiff's complaint asserts standing both in her own right and on behalf of her deceased mother. Because she does not press the claim of standing on her own[1], we shall proceed to examine her ability to sue on her mother's behalf.

The core of the standing inquiry is whether the party bringing suit has alleged the existence of an "injury-in-fact". *Association of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 152,

90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). To meet this requirement, a plaintiff must allege

> such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult … questions.

*Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The asserted injury to plaintiff's late mother is quite straightforward. The complaint alleges that Ms. Hunter's citizenship rights were diminished, in violation of her right to equal protection under the laws, solely because she was a woman: the statute grants a male citizen-parent—but denies a female citizen-parent—the ability to transmit citizenship to foreign-born children. This alleges an "injury-in-fact" for standing purposes.

What complicates the analysis here, however, is that the claim is brought not by Ms. Hunter herself, but by her daughter. Ordinarily, a party may not obtain standing by asserting the constitutional rights of others. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). Although this policy is not constitutionally mandated, prudential considerations act to protect the courts from "abstract, generalized grievance[s] that the courts are neither well equipped nor well advised to adjudicate." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 n. 5, 104 S.Ct. 2839, 2846 n. 5, 81 L.Ed.2d 786 (1984). This rule is relaxed when there are "weighty countervailing policies" that favor third-party standing. *Parker v. Levy*, 417 U.S. 733, 759, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974).

This case presents an appropriate occasion for permitting a plaintiff to serve as a surrogate in asserting the rights of a third party. *See e.g., Irving v. Clark*, 758 F.2d

---

1. We do, however, reject the government's spurious argument that plaintiff lacks standing because, as an alien born outside the United States, she falls outside the jurisdiction of the Equal Protection Clause of the Fourteenth Amendment. Plaintiff's claim, of course, is brought under the equal protection component implicit in the Due Process clause of the Fifth Amendment, which governs *federal* action. *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533 & n. 5, 93 S.Ct. 2821, 2825 & n. 5, 37 L.Ed.2d 782 (1973).

1260 (8th Cir.1985) (child of deceased landowner permitted to assert landowner's Fifth Amendment just compensation claim). Importantly, the government does not contend that permitting the daughter to sue on behalf of her deceased mother results in a controversy where the issues are "ill-defined" or where "third-party interests may not be sufficiently protected." *Elias,* 721 F.Supp. at 246. In this case, it cannot be disputed that plaintiff's interests are harmonious with and at least as strong as the interests that her mother herself would have asserted. *See Hong Kong Supermarket v. Kizer,* 830 F.2d 1078, 1081 (9th Cir.1987) (third party must be "as effective a proponent" of the right as holder of right would be).

Rather than contest plaintiff's assertion of third-party standing under the usual criteria, the government contends that additional undefined "prudential considerations" warrant adherence to the rule of self-restraint in this case. The government first notes the possibility that female United States citizens who gave birth abroad prior to 1934[2] would be both able and willing to assert their rights under the Fifth Amendment. Even assuming the existence of other potential plaintiffs, this argument lacks force. The government cannot deny that *plaintiff's* mother, who died over thirty years ago, is unable to press her claim. *Munson,* 467 U.S. at 956, 104 S.Ct. at 2846 (recognizing standing where "practical obstacles prevent a party from asserting rights on behalf of itself"). Nor are we persuaded that one plaintiff's ability to press her own claim does or should depend on the possibility that *other* plaintiffs may bring *other* claims. Nothing would be gained by passing these issues until they are presented by a citizen-mother herself. *Id.* at 956, 104 S.Ct. at 2846 (examining whether third party "can reasonably be expected properly to frame the

issues and present them with the necessary adversarial zeal").

The government then argues that we should restrict standing because otherwise an "exponentially" growing number of people will seek to " 'stand in the shoes' of a female citizen relative (now mother, tomorrow grandmother, *ad infinitum* )" and thus become "instant" citizens. The court finds this argument curious and unsupported. Not only has the government submitted no factual evidence that teeming hordes of distant descendants will flood the federal courts in pursuit of United States citizenship, but its legal analysis is without any basis. The government has cited no case—nor can we think of one—in which the court denied standing because of the inconvenience to the defendant of an adverse decision on the *merits.*

It is worth noting that the government did not contest—and in fact conceded—the standing issue in *Elias.*

> The interests of plaintiff and any rights her mother may have possessed with regard to § 1993 appear to be mutually interdependent.... Given these considerations, it appears that the prudential doctrine prohibiting standing to assert the rights of a third party might be relaxed to allow plaintiff to assert her mother's rights, if any, with regard to § 1993.

*Elias,* 721 F.Supp. at 246 (quoting Defendant's Supplemental Brief at 4). This court believes that the government's first impulse was the correct one. Accordingly, we find that plaintiff has standing to assert her late mother's equal protection claim.

## C. *Laches*

■ The government urges the application of the equitable defense of laches to plaintiff's claim, which was not brought until 1989, fifty-eight years after her birth. The defense of laches requires a showing of (1) inexcusable delay by the party bring-

---

**2.** In 1934, Congress amended § 1993. The amendment "granted citizenship, subject to a five-year continuous residence requirement and an oath, to the foreign-born child of either a citizen father or a citizen mother." *Rogers v. Bellei,* 401 U.S. 815, 824, 91 S.Ct. 1060, 1066, 28 L.Ed.2d 499 (1971). This amendment, though, has no effect on plaintiff's claim; her citizenship status is governed by "the statute that was in effect at the time of [her] birth." *Runnett v. Shultz,* 901 F.2d 782, 783 (9th Cir.1990).

ing suit, and (2) prejudice to the party asserting laches. *See Mission Indians v. American Management & Amusement Inc.*, 840 F.2d 1394 (9th Cir.1987), *cert. dismissed*, 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988). The government has failed to make a showing under either prong.

The government's allegations state merely that plaintiff's mother never brought suit and that plaintiff herself waited until 1989 before bringing suit. Although this constitutes a "delay", the government has offered no evidence that this delay was "inexcusable". It is undisputed that the right to the citizenship she seeks was recognized only recently in *Elias* and, moreover, that plaintiff filed suit just months after that decision was issued.

Nor has the government made any showing of prejudice from the delay. Because the facts in this case are uncontested, the government cannot be heard to say that plaintiff's claims are stale or that witnesses and evidence have disappeared. And it has not shown any shift in position in reliance on plaintiff's failure to bring a claim. Indeed, it has shown no prejudice at all. We are unwilling to invoke the harsh defense of laches to bar a significant constitutional claim on such a meager showing. *See Olegario v. United States*, 629 F.2d 204, 222 (2d Cir.1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981) (denying defense of laches where applicant had waited thirty years to enforce his claim of citizenship).

### D. *Standard of Review*

◼ Section 1993 discriminates between male and female citizens. The Supreme Court typically subjects gender classifications to at least an intermediate, if not a strict standard of review. *E.g., Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). When presented with a gender classification of this type, we would ordinarily inquire whether § 1993 was "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988).

The inquiry must be modified when the subject matter touches on areas, like immigration and alienage, where Congress's power is at its zenith. *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977). Congressional plenary power in these areas limits the scope of judicial inquiry into the propriety of such legislation. *Id.* The exact contours of this review, however, are uncertain. *Adams v. Howerton*, 673 F.2d 1036, 1042 (9th Cir.), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982) ("the Supreme Court has not determined what limitations, if any, the Constitution imposes on Congress"). The Court has sketchily outlined a very limited inquiry, consisting only of whether the citizenship law classification is based upon a " 'facially legitimate and bona fide reason.' " *Fiallo*, 430 U.S. at 794, 97 S.Ct. at 1479 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972)).

Although this test might initially appear to indicate a lower level of scrutiny than the rational basis test, the circuit courts have found "that no distinction is intended by the descriptive language and therefore conclude that the rational basis test is applicable." *Azizi v. Thornburgh*, 908 F.2d 1130, 1133 n. 2 (2d Cir.1990). The Ninth Circuit is in accord with this understanding:

> We do know that where there is a rational basis for Congress's exercise of its power, whether articulated or not, the Court will uphold the immigration laws that Congress enacts.

*Runnett v. Shultz*, 901 F.2d 782, 787 (9th Cir.1990). This test applies not only to challenges to statutes by aliens, but also to the claims asserted by citizens themselves, and governs even when citizens' fundamental constitutional rights are affected. *See Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (citizens' First Amendment rights). Consequently, we must examine § 1993, despite its gender classification, under our traditional rational-basis test for congressional legislation.

### E. *The Existence of a Rational Basis*

■ Under the rational-basis test, the government must prove that § 1993's distinction between the right of citizen-fathers and the right of citizen-mothers to transmit citizenship to their foreign-born offspring is rationally related to a legitimate governmental purpose.[3] *Moreno*, 413 U.S. at 528, 93 S.Ct. at 2821. The sole justification offered by the government in support of § 1993 is congressional concern over the problem of dual citizenship. According to the government, to have permitted the transmission of citizenship by citizen-mothers—on the same terms as that enjoyed by citizen-fathers—would have increased the incidence of dual citizenship. The government has amply demonstrated that dual citizenship is of genuine congressional concern. *See, e.g., Savorgnan v. United States*, 338 U.S. 491, 500, 70 S.Ct. 292, 297, 94 L.Ed. 287 (1950) ("The United States has long recognized the general undesirability of dual allegiance"). *But see* Orfield, *The Citizenship Act of 1934*, 2 U.Chi.L.Rev. 99, 104 (1934) ("Too often critics object to it [dual nationality] without assigning any reasons or very feeble ones"). The question thus narrows to whether § 1993 is rationally related to solving or reducing that problem.

We note at the outset that the government has offered no legislative history or other evidence that § 1993 was motivated by a concern over dual citizenship. Although a rationale need not be articulated by Congress, this court cannot consider a hypothetical purpose that "could not have been a goal of the legislation." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975). The danger in using hypothetical purposes is that the court "must be careful not to attribute to the [government] purposes which it cannot reasonably be understood to have entertained." *Christian Science Reading Room v. City and County of San Francisco*, 792 F.2d 124 (9th Cir. 1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct.

953, 93 L.Ed.2d 1002 (1987). In the absence of any expressed intent by Congress, the court must conduct its own inquiry regarding the practical effect of § 1993 in combatting dual citizenship.

Citizenship is established by the laws of each individual country. Those laws are generally classified into two types: *jus soli*, in which citizenship is based on the place of birth, and *jus sanguinis*, in which citizenship is based on the citizenship of one (or both) parents. Dual citizenship arises when both rules are applied:

> Birth in a state the law of which impresses upon the person the nationality under the *jus soli*, while the nationality of another country attaches because of the *jus sanguinis*, the parents (or one of them) being nationals of another state.

Orfield, *The Legal Effects of Dual Nationality*, 17 Geo.Wash.L.Rev. 427, 428 (1949). If there were uniformity in the rules of citizenship—that is, if citizenship were always determined either by the place of birth or by the nationality of the parents—then the problem of dual citizenship would never arise. Yet no such uniformity exists. Indeed, few countries have themselves relied exclusively on either *jus soli* or *jus sanguinis*, but have instead applied a hybrid of the two. *Id.* at 427. The United States, for example, bestows citizenship to persons born within the United States or its territories (*jus soli*) and to those born abroad to a citizen parent (*jus sanguinis*). *Id.* at 432. The combination of these overlapping citizenship rules "must inevitably lead to cases of dual nationality as to children of foreign parents." *Id.* at 427.

Understanding that dual citizenship is an unavoidable result of the world's citizenship statutes, we must then inquire into § 1993's usefulness in limiting the incidence of dual citizenship. Under § 1993, the foreign-born child of a citizen-father took American citizenship. In most countries, that child would also have gained the

---

**3.** It is agreed that no citizen has the "right" to transmit citizenship by descent. *Rogers v. Bellei*, 401 U.S. 815, 830, 91 S.Ct. 1060, 1068, 28 L.Ed.2d 499 (1971). The issue here concerns solely the legitimacy of the differing abilities of male and female citizens to transmit citizenship by descent.

citizenship of his or her birthplace.[4] In others, the child would have been granted the citizenship of the mother.[5] In either case, the child had dual citizenship. Orfield, *supra*, 2 U.Chi.L.Rev. at 104 ("it should be borne in mind that dual nationality already exists as to the children of American fathers"). By contrast, the foreign-born child of a citizen-mother, under § 1993, was *not* an American citizen and, consequently, could not have been a dual citizen.

Under this scheme, citizen-fathers were permitted to create dual citizenship for their offspring while citizen-mothers were not. At first glance, then, it would seem that the government's contention is correct: § 1993 *does* reduce the incidence of dual citizenship. Had the statute permitted citizen-mothers to transmit citizenship to their foreign-born offspring, it most certainly would have increased the number of citizens with dual allegiances.

But the distinction embodied in § 1993, despite its effectiveness, cannot withstand even the most deferential scrutiny. In discriminating between men and women in their ability to transmit citizenship, Section 1993 is hardly a reasoned response to the citizenship laws of other countries. Congress could as easily have chosen to limit the incidence of dual citizenship by preventing citizens who are black, citizens with blond hair, or citizens who were born on odd-numbered days from transmitting United States citizenship to their foreign-born offspring.[6] Each of these classifications would equally as effectively have limited the incidence of dual citizenship. Yet, none of these classifications can be described as anything more than an arbitrary and capricious limitation on the ability to transmit citizenship. *See Bowen v. Owens*, 476 U.S. 340, 352, 106 S.Ct. 1881, 1888, 90 L.Ed.2d 316 (1986) (Marshall, J., dissenting). The justification that we must reduce dual citizenship by permitting male citizens—but not female citizens—to create dual citizens is no justification at all.

Our skepticism of the government's hypothesized purpose only intensifies after a closer examination of the laws of other countries. In a few of the countries, citizenship was bestowed *jus soli* only if the *mother* was also a citizen of that country. For example, the Persian born child of American and Persian parents would have had dual citizenship if (and only if) the *father* were American. Flournoy, *supra*, at 558. On the other hand, the Persian born offspring of an American mother and a Persian father would have been exclusively an American citizen. Thus, dual citizenship would have been more effectively reduced by application of a rule precisely the *opposite* of § 1993.[7] Based on the historical facts, we are compelled to conclude that the government's asserted purpose "could not have been a goal of the legislation." *Weinberger*, 420 U.S. at 648

---

4. At the time § 1993 was in effect, the great majority of nations transmitted citizenship under *jus soli* or a limited variant of that rule. Orfield, *supra*, 2 U.Chi.L.Rev. at 104. Only a few countries (namely, Austria, Hungary, Germany, Norway, Russia, Rumania, Serbia, China, and Japan) transmitted citizenship by *jus sanguinis* alone. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, 555 (1921).

5. "A number of states confer citizenship *jure sanguinis* upon children, if one of the parents is a national even though such parent be the mother." Orfield, *supra*, at 433. Thus, even if *jus soli* did not apply, the child would be a dual citizen by descent through the mother.

6. The arbitrary aspect of the discrimination was aptly captured by Professor Orfield:

   As an original matter, why accept dual nationality as to the fathers and deny it as to the

offspring? Or why not let only the mother transmit nationality?

Orfield, *supra*, 2 U.Chi.L.Rev. at 104.

7. True, in a few other countries, the child of a mixed citizenship marriage would have taken only the citizenship of the father. *Nationality Laws* (R. Flournoy, Jr., and M. Hudson, eds.) (1929). In Syria, for example, the native born child of an American father and a Syrian mother would have been an American citizen. *Id.* at 301 (Order No. 16/S of January 19, 1925). In comparison to the total number of countries, however, the number having laws like Syria's or Persia's was quite small. The fact remains that in most cases, the foreign-born children of American fathers in mixed citizenship marriages were dual citizens. Crozier, *The Changing Basis of Women's Nationality*, 8 B.U.L.Rev. 129, 152 (1934).

n. 16, 95 S.Ct. at 1233 n. 16, 43 L.Ed.2d 514 (1975).

Although it would be sufficient to base our holding on the transparent arbitrariness of § 1993 as just outlined, it appears that citizen-mothers were singled out in more than a random fashion. The government concedes that the statute, in penalizing female citizens, is based on "outdated" stereotypes that "perhaps[ ] never should have had a place in American jurisprudence and legislation," Def's. Mem. at 10, but argues that Congress's primary intention was not to further such stereotypes. Instead, the government contends that Congress, in singling out women for a special disability, was merely responding to prevailing prejudices in our nation and elsewhere. Even in 1934, when Congress remedied the discriminatory treatment of male and female citizens, few nations had "fully equalized" citizenship rights between men and women. 78 Cong.Rec. 7331–32 (1934) (Rep. Dickstein). The government is thus quite correct in pointing out that many countries denied their female citizens the right to transmit citizenship to their foreign-born offspring.

That other countries had similarly discriminatory laws, though, does not justify Section 1993's own arbitrary distinctions. The mimicry of external prejudices cannot itself constitute a legitimate purpose. It matters not that congressmen bore no particular animus toward citizen-mothers in crafting the limitations of § 1993, so long as they were motivated—as the government apparently concedes—by the prejudices and stereotypes suffered by women at that time. Put most plainly, the government may not justify a discriminatory law by relying on the prejudices of others.

The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (rejecting "best interests of child" as justification for removing child from mixed-race couple; the Court found the asserted justification to be based on "private biases").

We thus find that the government has failed to prove that § 1993 is rationally related to a legitimate governmental purpose. The distinction that is drawn in the statute between the ability of citizen-fathers and citizen-mothers to transmit citizenship to their foreign-born offspring is wholly arbitrary and lacks any justification. We likewise find that Congress may not salvage the distinction between male and female citizens by reference to the prejudices practiced at that time.

F. *The Court's Power to Award Citizenship*

The government urges that even if the court finds § 1993 unconstitutional, it lacks the power to award citizenship or to make any other effective relief. This argument arrives in two parts. *First,* the government notes that when § 1993 was amended to equalize the treatment between citizen-mothers and citizen-fathers, Congress expressly chose not to make the revision retroactive. This court, it concludes, ought to defer to that decision. *Second,* the government argues that the power to grant citizenship is vested exclusively in Congress and may not be exercised by the judiciary. We reject both arguments.

1. Congress's Refusal to Grant Retroactive Effect

In 1934, Congress amended § 1993 to embrace the foreign-born offspring of citizen-mothers on a footing equal to that of citizen-fathers. Act of May 24, 1934, § 1, 48 Stat. 797.[8] There is no dispute that

---

**8.** The amended statute then read as follows: Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend

to any such child unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child. In cases where one of the parents is an alien, the right of citizenship shall not descend unless the child comes to the United States and resides therein for at least five

Congress's revision to § 1993 had no retroactive effect. *Elias*, 721 F.Supp. at 244.

The government analogizes Congress's decision not to accord retroactive effect to the judiciary's ability to grant only prospective relief when declaring laws unconstitutional. *See, e.g., Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) ("Where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity"). In the government's view, Congress, like the courts, consciously chose not to apply its relief in a retrospective manner. The government then urges the court to respect Congress's decision to limit itself to prospective relief.

As a preliminary matter, we would be unwilling to defer in this instance even assuming that deference were permissible. When courts elect not to apply a ruling retroactively, they are governed by equitable concerns of "what is necessary, what is fair and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). For example, courts will not apply a decision retroactively if it "could produce substantial inequitable results." *Cipriano*, 395 U.S. at 706, 89 S.Ct. at 1900. This involves an analysis of—among other factors—the extent to which settled expectations would be upset or the extent to which the parties would be inconvenienced by an alteration in the existing framework. It would then seem that any theory of deference to congressional decisions would have to permit an inquiry into the legislative determination of the above equitable factors. In this case, the government has made no showing that the non-retroactive revision of § 1993 was compelled by any such considerations. Indeed, the government offers no evidence indicating that there was a conscious decision to make the relief solely prospective. Thus, assuming that Congress would be entitled to deference in its choice to correct constitutional

violations in solely a prospective manner, we would be loath to defer blindly where, as here, there is no evidence that Congress analyzed the equitable factors and no evidence—other than the government's say-so—that Congress consciously intended to limit its relief.

More importantly, though, we must reject the government's novel theory of deference, a theory for which the government has failed to muster any case support. Under the regime urged by the government, all constitutional claims based on federal action could be defeated by subsequent legislative amendment. Presumably, the federal courts, for example, would be unable to offer relief to a flag burner convicted under an unconstitutional statute that was later repealed by Congress. Although we agree that Congress has a role to play in interpreting and extending rights under the Constitution, *see Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (deferring to Congress's remedial power under § 5 of the Fourteenth Amendment), we do not believe that Congress has been ceded an exclusive power to define remedies for constitutional violations.

### 2. The Judiciary's Power to Grant Citizenship

■ The government's final argument is that even if § 1993 is found to be unconstitutional, this court lacks the power to confer citizenship on an alien in the absence of a specific statutory authorization. The government's brief relies heavily on the recent Supreme Court decision in *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). *Pangilinan* has broad language that at first appears to support the government's position. The Court there stated:

> Once it has been determined that a person does not qualify for citizenship ... the district court has no discretion to ignore the defect and grant citizenship.... Neither by application of the doctrine of estoppel, nor by invocation of

---

years continuously immediately previous to his eighteenth birthday, and unless, within six months after the child's twenty-first birthday,

he or she shall take an oath of allegiance to the United States of America as prescribed by the Bureau of Naturalization.

equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations.

*Id.* at 884–85, 108 S.Ct. at 2216. Considered in isolation, this language does appear to preclude the courts from fashioning a remedy that includes the conferral of citizenship in violation of § 1993.

Yet, upon closer analysis of the Court's opinion, we are convinced that the government's reading is insupportably overbroad. The emphatic pronouncements quoted above were made explicitly in the context of a discussion of the applicants' equitable estoppel claims. 486 U.S. at 882–85, 108 S.Ct. at 2215–17. The Court nowhere indicated that *constitutional* claims were to be treated in a similar fashion. On the contrary, after limiting the power of the judiciary to award citizenship, the Court continued its discussion by analyzing "as an alternative ground for affirmance" the applicants' claims "under the Due Process Clause of the Fifth Amendment and under its equal protection component." *Id.* at 885, 108 S.Ct. at 2216. The plain meaning of this sequence is that the Court drew a distinction between constitutional and nonconstitutional claims of citizenship, and wished to circumscribe the judicial power only over the latter.

The distinction between constitutional and other challenges to citizenship statutes is well-grounded in the case law. The District of Columbia Circuit has opined that courts are able to grant relief to aliens, even if such relief would contravene congressional enactments, if the alien demonstrates a *constitutional* violation. *In re Thornburgh,* 869 F.2d 1503, 1515–16 (D.C. Cir.1989). In addition, the Second Circuit has distinguished estoppel claims from constitutional claims in naturalization cases in determining the appropriate relief. *Olegario v. United States,* 629 F.2d 204, 221 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). The

government has cited no cases in which the courts have been barred from granting citizenship as a remedy for a constitutional violation. Accordingly, we read *Pangilinan's* limitation on the power of courts to apply only to nonconstitutional claims.[9]

## IV. CONCLUSION

For the foregoing reasons, we find § 1993's differential treatment of male and female citizens to be wholly without a rational basis and thus unconstitutional under the standard of review articulated in *Fiallo v. Bell,* 430 U.S. 787, 794, 97 S.Ct. 1473, 1479, 52 L.Ed.2d 50 (1977). The court also finds that it has the power to grant the relief requested. Plaintiff's motion for summary judgment is therefore granted, and the government's motion to dismiss is denied.

IT IS SO ORDERED.

---

**9.** Even if we accepted the government's reading of *Pangilinan,* we would nonetheless be unable to grant its motion to dismiss. At most, *Pangilinan* disapproved only the lower court's asserted "power to make someone a citizen of the United States." 486 U.S. at 883, 108 S.Ct. at 2216. Plaintiff might still be entitled to other forms of relief, such as permanent residency, a permanent stay of deportation, or a work permit. *In re Thornburgh,* 869 F.2d at 1517.