**Valerie Isabelle WAUCHOPE; Ellen Mary Kinahan, Plaintiffs–Appellees,**

v.

**UNITED STATES DEPARTMENT OF STATE, Secretary of State, James Baker, Defendants–Appellants.**

**No. 91–15482.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 12, 1992.

Decided Feb. 16, 1993.

John S. Koppel, U.S. Dept. of State, Washington, DC, for defendants-appellants.

Susanna Igleheart, James M. Byrne, Byrne, Igleheart & Byrne, San Francisco, CA, for plaintiffs-appellees.

Before FLETCHER, POOLE and T.G. NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

The United States Department of State and the Secretary of State appeal the decision of the district court declaring two foreign-born offspring of United States citizen mothers to be citizens of the United States. We affirm.

## I.

Valerie Wauchope was born in Canada, on July 11, 1931, to a United States citizen mother (Nora Greenaway Hunter, nee Armstrong, born in New York in 1904) and a Canadian citizen father. Both her parents are now deceased. On October 31, 1989, Wauchope applied for a United States passport in San Francisco, claiming that she was an American citizen by virtue of her mother's citizenship. Her application was denied on the grounds that the relevant statute, Section 1993 of the Revised Statutes of 1874, awards United States citizenship to the foreign-born offspring of United States citizen fathers but not to the foreign-born offspring of United States citi-

zen mothers.[1] Section 1993 was amended in 1934 to provide that any child "hereafter born" outside of the United States to either a United States citizen father or mother is also a United States citizen given the fulfillment of certain residency requirements. Act of May 24, 1934, ch. 344, § 1, 48 Stat. 797. By its terms, however, the amendment did not apply to individuals like Wauchope who were born prior to its enactment. "[W]hen, in 1934, Congress finally granted citizenship rights to the foreign-born children of citizen mothers, 48 Stat. 797, it not only specifically made the provision prospective, but further made clear its view that this was a reversal of prior law." *Montana v. Kennedy*, 366 U.S. 308, 312, 81 S.Ct. 1336, 1339, 6 L.Ed.2d 313 (1961).

After exhausting her administrative remedies, Wauchope commenced this action in district court against the United States Department of State and the Secretary of State in his official capacity (the United States). She claimed that, prior to its amendment in 1934, Section 1993 violated the equal protection rights of American citizen females like her mother because it conferred United States citizenship only on the foreign-born children of United States citizen males. Wauchope sought an order enjoining defendants from rejecting her passport application and declaring her to be a citizen of the United States.

The district court granted Wauchope's motion for summary judgment in a published opinion filed January 31, 1991. *Wauchope v. United States Department of State*, 756 F.Supp. 1277 (N.D.Cal.1991). The court rejected the United States' arguments that Wauchope lacks standing to vindicate her mother's equal protection rights and that the defense of laches bars her suit. On the merits, it held that the

gender-based distinction embodied in Section 1993 does not survive even the most deferential scrutiny, and hence represents a violation of the equal protection component of the Fifth Amendment's due process clause. The court concluded that it enjoyed the authority to award Wauchope citizenship as a remedy for the violation.

The parties subsequently stipulated that Wauchope's complaint be amended to add a second plaintiff, Ellen Kinahan. Kinahan was born on April 20, 1925 in Ireland to an American citizen mother (Mary Punch, nee Hartnett, born in New York in 1896) and an Irish citizen father. Both her parents are now deceased. Kinahan applied for a United States passport on December 3, 1990 but her application was denied on the same grounds as Wauchope's. On March 7, 1991, the district court granted the motion to amend the complaint and declared its order awarding Wauchope summary judgment applicable to Kinahan. This appeal followed.

## II.

■ The United States argued below that the plaintiffs lack standing to press the claim that Section 1993 violates the equal protection rights of their mothers. While the United States has abandoned this argument on appeal, we have an obligation to address it as it calls into question the propriety of the district court's exercise of jurisdiction. *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 954 n. 4, 104 S.Ct. 2839, 2845 n. 4, 81 L.Ed.2d 786 (1984).

There is no dispute that the instant action satisfies the "case or controversy" requirement of Article III of the United States Constitution. The plaintiffs have

---

1. The statute reads as follows:

   *All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.*

   Revised Statutes of 1874, § 1993. Section 1993 represented the reenactment, without signifi-

cant change, of Section 1 of the Act of Feb. 10, 1855, ch. 71, 10 Stat. 604. Prior to 1855, children born abroad to United States citizens who themselves had become citizens before April 14, 1802 received American citizenship (so long as their fathers had at some point resided in the United States), while children of those who had become citizens after April 14, 1802 did not. Act of Apr. 14, 1802, ch. 28, § 4, 2 Stat. 155; Act of March 26, 1790, 1 Stat. 103.

suffered a concrete injury as a result of the United States' interpretation and enforcement of Section 1993: they have been denied United States citizenship. This showing of injury suffices to meet constitutional standing concerns. *Id.* at 954–55, 104 S.Ct. at 2845–46.

Since the plaintiffs seek to vindicate not their own constitutional rights but those of their mothers, they must also demonstrate that the prudential limitations imposed by the courts on assertions of third party standing do not serve as a bar to their action. "[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). "This fundamental restriction on our authority admits of certain, limited exceptions. We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: the litigant must have suffered an 'injury-in-fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, — U.S. —, — – —, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976) (citations omitted)). Here, as explained above, the plaintiffs have suffered a concrete injury. Moreover, their interests coincide with those of their mothers and are equally as intense. Finally, their mothers are deceased and can no longer press an equal protection claim on their own behalf. Thus, the district court correctly concluded that the plaintiffs have standing to challenge Section 1993.

### III.

■ The United States argues that the defense of laches bars the plaintiffs' claims of citizenship. Plaintiff Kinahan, it notes, was born in 1925, while plaintiff Wauchope was born in 1931. Not until 1989, however, did either one seek a United States passport, and not until 1990 did they commence their efforts in court to have Section 1993 declared unconstitutional.

■ "Laches is an equitable time limitation on a party's right to bring suit." *Boone v. Mechanical Specialties Co.*, 609 F.2d 956, 958 (9th Cir.1979). To successfully establish the defense, "a party must show (1) there was inexcusable delay in the assertion of a known right and (2) the party asserting laches has been.prejudiced." *Barona Group of the Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc.*, 840 F.2d 1394, 1407 (9th Cir.1988), *cert. dismissed*, 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988); *see also Trustees for Alaska Laborers v. Ferrell*, 812 F.2d 512, 518 (9th Cir.1987).

Here, the plaintiffs are not guilty of inexcusable delay in the assertion of a known right. It was not until 1989 that a court (the same district court that ruled on the plaintiffs' arguments below) found Section 1993 to violate the equal protection rights of United States citizen mothers. *See Elias v. United States Department of State*, 721 F.Supp. 243 (N.D.Cal.1989). Prior to that time, the Supreme Court, while not passing on the constitutionality of Section 1993, had unequivocally declared that as a matter of statutory construction the children of United States citizen mothers born outside of this country before 1934 were not entitled to United States citizenship. "[W]e hold that at the time of petitioner's birth [prior to 1934], R.S. § 1993 provided the sole source of inherited citizenship status for foreign-born children of American parents. That statute cannot avail this petitioner, who is the foreign-born child of an alien father." *Kennedy*, 366 U.S. at 312, 81 S.Ct. at 1339. As the district court noted, plaintiffs filed suit only months after its favorable decision in *Elias* was handed down. We conclude there was no inexcusable delay in bringing their action. *See Mission Indians*, 840 F.2d at 1407 ("AMA has failed to demonstrate inexcusable delay or prejudice. The

Band filed this action six days after our decision in *A.K. Management [Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785 (9th Cir.1986)] established that tribal bingo management agreements are void without BIA approval.").

■ Furthermore, the United States has made no showing of prejudice arising from the plaintiffs' delay. For the purposes of a laches defense, prejudice typically refers to the fact that a defendant no longer has witnesses or evidence available to it as a result of the passage of time, or that it has altered its position in reliance on a plaintiff's inaction. " 'Common forms of prejudice to defendant are loss of evidence to meet the claim of plaintiff, change in situation induced by the delay, and change in the value of the subject-matter involved. . . . ' " *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.*, 913 F.2d 676, 696 (9th Cir.1990) (quoting H. McClintock, *Handbook of the Principles of Equity* 71–72 (2d ed. 1948)); *see also Ferrell*, 812 F.2d at 518 ("Traditionally, laches is invoked when witnesses have died or evidence has gone stale."); *Boone*, 609 F.2d at 959 (finding prejudice where defendant's witnesses no longer available due to the passage of time).

■ The plaintiffs' challenge is a purely legal one to the constitutionality of Section 1993. There is no dispute as to the facts of the plaintiffs' cases. We, as did the district court, simply have to decide whether Section 1993 comports on its face with the constitutional guarantee of equal protection. Thus, the United States does not claim that the plaintiffs' delay has prevented it from introducing important witnesses or evidence. Nor does it claim that it has in any way altered its position in reliance on the plaintiffs' inaction. Its sole assertion of prejudice is its claim that, if the plaintiffs prevail, it will be forced to confer citizenship on them. "Our point on laches, stated succinctly, is that the United States is prejudiced when it must accept as citizens ... individuals who have lived their entire lives as foreign citizens, and who until very recently have not demonstrated the slightest interest in assuming the rights and responsibilities of American citizenship." *Reply Brief for the United States* at 3. However, the mere prospect that a defendant might lose a case does not suffice to warrant the imposition of laches as a barrier to a plaintiff's action. "[T]he prejudice requirement does not mean merely that the defendant will be worse off if the relief is granted than he would be if it were not; that sort of prejudice could be claimed by all defendants all of the time." *American Coupon Exchange*, 913 F.2d at 696. The district court properly rejected the laches defense.

## IV.

### A.

Section 1993 draws distinctions among individuals on the basis of their gender. It accords to American citizen males, but not to American citizen females, the right to pass on their citizenship to their foreign-born offspring. It is this gender-based classification which the plaintiffs challenge as a violation of the equal protection component of the Fifth Amendment's due process clause.

■ Normally, "the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification ... The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " *Mississippi University for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981) and *Wengler v. Druggists Mutual Ins.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)). *See also Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). However, the United States argues that the Supreme Court's decisions in *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), and *Kleindienst v. Mandel*, 408 U.S. 753,

92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), dictate that we treat Section 1993 with greater deference.

The *Mandel* Court considered a challenge brought by a group of American academics to the Attorney–General's refusal to grant a Marxist scholar from Belgium a temporary nonimmigrant visa in order that he could address them. The academics claimed that the Attorney–General's action violated their First Amendment right to hear and debate Mandel. The Court acknowledged the existence of a "First Amendment right to 'receive information and ideas,'" *Mandel*, 408 U.S. at 762, 92 S.Ct. at 2581 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969)), but declined to subject the decision of the Attorney–General (who was operating pursuant to a delegation of authority by Congress) to the strict scrutiny normally applied to actions implicating such a right. Pointing to "Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden,'" *Mandel*, 408 U.S. at 766, 92 S.Ct. at 2583 (quoting *Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (1967)), the Court upheld the decision as based upon a "reason [that] was facially legitimate and bona fide." *Mandel*, 408 U.S. at 769, 92 S.Ct. at 2585.

In *Fiallo*, the Court again rejected the notion that where "challenges to immigration legislation [are] based on [the] constitutional rights of citizens ... [a] searching judicial scrutiny is required." *Fiallo*, 430 U.S. at 794, 97 S.Ct. at 1479. It upheld those sections of the Immigration and Nationality Act of 1952 denying preferential immigration status to the illegitimate children of United States citizen or permanent lawful resident fathers, and to the fathers of illegitimate citizen or permanent lawful resident children.[2] In the face of claims that these provisions implicated the fundamental rights of United States citizens in a

familial relationship, and impermissibly discriminated between such citizens on the basis of gender and illegitimacy, the Court declined to utilize "a more exacting standard [of scrutiny] than was applied in *Kleindienst v. Mandel*," *Fiallo*, 430 U.S. at 795, 97 S.Ct. at 1479, and upheld the challenged provisions as constitutional. *See also Adams v. Howerton*, 673 F.2d 1036, 1041–42 (9th Cir.) (rejecting claim that strict scrutiny should apply to statute according preferential immigration status to heterosexual, but not to homosexual, spouses of United States citizens on grounds that cases including *Mandel* and *Fiallo* allow for only a limited judicial review of Congress' decision to admit or exclude aliens), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982).

The United States argues that we should similarly uphold Section 1993 if we determine that the statute's gender-based classification is supported by a facially legitimate and bona fide reason. "[I]t is readily apparent that the statute at issue should be reviewed under the very deferential standard articulated by the Supreme Court in other cases involving constitutional challenges to statutes in the area of immigration and nationality—*i.e.*, the statute must be upheld if it is based upon a 'facially legitimate and bona fide reason.'" *Reply Brief for the United States* at 5–6 (citations omitted). This argument does not necessarily follow. *Mandel* and *Fiallo* undoubtedly counsel deference towards Congressional legislation concerning immigration and naturalization. They declare that where Congress (or, through the exercise of delegated power, the Executive Branch) has decided that only certain aliens should be accorded favorable treatment, be it in the form of a temporary visa, the grant of preferential immigration status, or the award of citizenship, the courts' role in assessing such a decision is a limited one. "[I]t is important to underscore the limited scope of judicial inquiry into immigration

---

2. The statute granted such status to the mothers of illegitimate citizen or permanent lawful resident children, to the illegitimate children of citizen or permanent lawful resident mothers, and to all parents and children of citizens or permanent lawful residents where the children were legitimate.

legislation ... [We have] repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo,* 430 U.S. at 792, 97 S.Ct. at 1478 (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909) and citing *Mandel*).

However, as the Court declared in *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976), "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Diaz,* 426 U.S. at 79–80, 96 S.Ct. at 1891. Unlike the governmental decisions at issue in *Fiallo* and *Mandel,* Section 1993 represents not a Congressional determination that various aliens should or should not be treated in a certain manner, but rather a decision as to who is a citizen in the first instance. This type of decision strikes us as fundamentally different from one concerning individuals as to whose alienage there exists no dispute, such that we should perhaps utilize a more traditional (and hence more rigorous) standard of scrutiny in assessing it.

In *Runnett v. Shultz,* 901 F.2d 782 (9th Cir.1990), we considered a challenge to the Nationality Act of 1940, which provided that only those United States citizens who had resided in this country for ten years prior to the birth of a child in another country were entitled to transmit their citizenship to the foreign-born child. The plaintiff mother and child contended that the Act violated the guarantees of equal protection by according more lenient treatment to foreign born illegitimate children, who were regarded as citizens if their mothers had lived in the United States for any period of time. Without considering whether a difference exists between statutes that apply to aliens and those that are determinative of citizenship in the first instance, we indicated that, since "[t]he Supreme Court has recognized that Congress has almost plenary power in immigration legislation," we would assess the Nationality Act under a deferential standard of review. *Runnett,* 901 F.2d at 787. Following the lead of *Runnett,* we conclude that we should subject Section 1993 to the level of scrutiny advocated by the United States. Thus, we will limit our inquiry to the question whether a "facially legitimate and bona fide reason" exists to justify the gender-based distinction drawn by the statute.[3]

### B.

■ The United States sets forth the following rationale in support of Section 1993. During the time that the statute was in effect, the government contends, "[m]uch of the world ... regarded the children of mixed-citizen marriages as obtaining the citizenship of the father." *Brief for the United States* at 23. Only thirteen countries accorded mothers the same right as fathers to pass their citizenship onto their children regardless of where those children were born (that is, pursuant to the principle of *jus sanguinis,* or citizenship by descent). *Brief for the United States* at 23–24 and n. 11.[4] Furthermore, the government asserts, most nations restricted the application of *jus soli,* the principle

---

**3.** We have suggested that the standard of review prescribed by the Supreme Court with respect to immigration legislation is the same as the "rational basis" test typically utilized in equal protection cases (so long as suspect classes or fundamental rights are not involved). "We conclude that our use of the rational-basis standard of review ... is consistent with the Supreme Court's approach as reflected in [*Fiallo*]." *United States v. Barajas–Guillen,* 632 F.2d 749, 752 (9th Cir.1980). The Second Circuit has also equated the search for a "facially legitimate and bona fide reason" with the rational basis test. "Noting the 'facially legitimate and bona fide reason' language used by the Supreme Court in *Mandel,* the government suggests that this mandates a lower level of scrutiny than is required by the rational basis test. We find that no distinction is intended by the descriptive language and therefore conclude that the rational basis test is applicable." *Azizi v. Thornburgh,* 908 F.2d 1130, 1133 n. 2 (2nd Cir.1990).

**4.** The United States asserts that "only Argentina, Chile, Columbia, the Dominican Republic, Ecuador, Nicaragua, Panama, Paraguay, Peru, the Soviet Union, Turkey, Uruguay, and Venezuela gave to the mother the same right [as a father] to transmit citizenship to a minor legitimate child." *Brief for the United States* at 23 n. 11.

pursuant to which citizenship automatically devolves on those born on a country's soil, to instances in which a child's father was a citizen of the country. *Id.* at 24; *Reply Brief for the United States* at 8 ("[M]uch of the world in the nineteenth and early twentieth centuries ... *did not confer citizenship by jus soli ... under these circumstances* [of paternal alienage].") (emphasis in original).

Thus, the United States argues, by conferring citizenship on children born abroad only where the fathers of those children were American citizens, Congress largely avoided the problem of dual nationality. Since foreign countries were unlikely to confer citizenship on the children of American fathers, allowing those fathers to transmit their citizenship did not create a large class of dual nationals. Granting United States citizen mothers the same right to pass on their citizenship would, by contrast, have given rise to many instances of dual citizenship, as the foreign-born offspring would also have been treated as citizens of their fathers' countries.

■■■ The fact that the government's proposed rationale for Section 1993's gender-based distinction is nowhere stated in the text or legislative history of the statute is not fatal to the government's argument.[5] Where a statute is assessed pursuant to a deferential standard of review, "it is constitutionally irrelevant whether the justification proffered by the government was in fact the reasoning that generated the legislative classification." *Barajas–Guillen,* 632 F.2d at 754. However, courts "need not in equal protection cases accept at face value assertions of legislative purposes, when ... the asserted purpose could not have been a goal of the legislation." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975). " '[W]e [must be] care-

ful not to attribute to the [government] purposes which it cannot reasonably be understood to have entertained.' " *Christian Science Reading Room v. City and County of San Francisco,* 792 F.2d 124, 124 (9th Cir.1986) (quoting *Delaware River Basin Commission v. Bucks County Water & Sewer Authority,* 641 F.2d 1087, 1097 (3rd Cir.1981), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987)).

The district court properly recognized that "[t]he Congress has an appropriate concern with problems attendant on dual nationality." *Rogers v. Bellei,* 401 U.S. 815, 831, 91 S.Ct. 1060, 1069, 28 L.Ed.2d 499 (1971). However, it rejected the government's argument in support of Section 1993 because it could not accept the assertion that most nations in the late nineteenth and early twentieth centuries would not have recognized a child born on their soil to a United States citizen father to be one of their own. The court found that "[i]n most countries, that child would also have gained the citizenship of his or her birthplace." *Wauchope,* 756 F.Supp. at 1283–84; *see also id.* at 1284 n. 4 ("At the time § 1993 was in effect, the great majority of nations transmitted citizenship under *jus soli* or a limited variant of that rule."). Thus, it concluded that a desire to avoid the complications of dual citizenship could not " 'have been a goal of the legislation.' " *Wauchope,* 756 F.Supp. at 1284 (quoting *Weinberger,* 420 U.S. at 648 n. 16, 95 S.Ct. at 1233 n. 16).

We agree with the district court. At the time that Section 1993 was in effect, a significant number of countries provided that individuals born on their soil acquired their citizenship. This was the rule at English common law, Richard Flournoy, Jr., *Dual Nationality and Election,* 30 Yale L.J. 545, 548 (1921). It has persisted in that country to this day, and from it has sprung not only the adherence of our na-

---

5. The United States notes in its brief to this court that Section 1993's gender-based distinction was mentioned only once in the debates accompanying the passage of the statute or that of its predecessor, Section 1 of the Act of Feb. 10, 1855, ch. 71, 10 Stat. 604. *Brief for the United States* at 29. Thus, Representative Cutting, who proposed the 1855 Act, observed that

"[i]n the reign of Victoria, in the year 1844, the English Parliament provided that the children of English mothers, though married to foreigners, should have the rights and privileges of English subjects, though born out of allegiance. I have not, in this bill, gone to that extent, as the House will have observed from the reading of it." *Cong. Globe,* 22d Cong., 1st Sess. 170 (1854).

tion, *see Rogers v. Bellei,* 401 U.S. 815, 828, 91 S.Ct. 1060, 1068, 28 L.Ed.2d 499 (1971) ("our law in this area follows English concepts with an acceptance of the *jus soli*"), but also that of the Commonwealth countries (including Canada, the place of Valerie Wauchope's birth) and of Ireland, the place of Ellen Kinahan's birth, to the principle of *jus soli.* The list of other countries bestowing citizenship on those born within their limits (though sometimes in conjunction with a residency or declaration requirement) is extensive, and includes many of the countries of South and Central America as well as of Europe. *A Collection Of Nationality Laws of Various Countries* (Richard W. Flournoy, Jr. and Manley O. Hudson eds., 1929); Flournoy, 30 Yale L.J. at 554–559.

Thus, the government is simply incorrect in asserting that, "from the U.S. perspective, dual citizenship was a potential problem primarily for foreign-born children of U.S. citizen mothers and alien fathers." *Brief for the United States* at 24. Because a significant majority of countries adhered to some gender-neutral version of the principle of *jus soli,* a sizeable proportion of children born abroad acquired the citizenship of a foreign country. By also deeming those children United States citizens where their fathers were American, Section 1993 inevitably gave rise to numerous instances of dual citizenship. "[I]t should be borne in mind that … dual nationality already exists as to the children of American fathers." Lester Orfield, *The Citizenship Act of 1934,* 2 U.Chi.L.Rev. 99, 104 (1934) (commenting on the operation of Section 1993 prior to its amendment in 1934). Avoiding the problems of dual nationality thus cannot reasonably be posited as a basis for Section 1993's distinction between the ability of American citizen mothers and fathers to transmit citizenship to their foreign-born offspring. The United States has failed to set forth a facially legitimate and bona fide reason to justify the statute's unequal treatment of citizen men and women.[6]

## V.

■ The United States contends that even if we agree with the district court's conclusion that Section 1993 represents an equal protection violation, we should nevertheless reverse the court's order because it lacked the authority to declare the plaintiffs citizens of this country.

■ Normally, a court may remedy "the injuries caused by a constitutionally

---

**6.** This conclusion is not altered by the United States' assertion that Section 1993 and its predecessor, Section 1 of the Act of February 10, 1855, 10 Stat. 604, represented the first steps in grafting the principles of *jus sanguinis* onto American nationality law. As the Supreme Court made clear in *Lyng v. Castillo,* 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986), a case relied on by the government, where Congress takes certain legislative steps and not others, it must possess a rationale for doing so commensurate with the type of distinction it has drawn. *Id.* at 643, 106 S.Ct. at 2732 (concluding that Congress had a rational basis for enacting strict limitations on food stamp benefits for close family members living together, a nonsuspect class, while retaining less stringent requirements for other individuals sharing a home).

Nor does the fact that Congress acted in 1934 to eliminate prospectively Section 1993's gender distinction immunize from judicial review its earlier violations of equal protection. As the district court noted, the government provides no support for its "novel theory" that it is the province of Congress, rather than the judiciary, to define remedies for constitutional violations.

The government baldly misstates the holding of *Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984), in this regard. *Mathews* does not, contrary to government's assertion, "establish[ ] that Congress may correct an unconstitutional statute prospectively." *Brief for the United States* at 33. The case involved provisions of the Social Security Act passed by Congress in response to the Supreme Court's decision in *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977). That decision had invalidated a gender-based classification embodied in the spousal-benefit provisions of the Act. Congress subsequently revamped the social security laws and eliminated the discriminatory provisions passed on in *Goldfarb.* However, it revived the gender-based classification, in a limited fashion, in a new provision of the Act involving the offset of pension benefits. The *Mathews* Court subjected this provision to a new round of scrutiny and concluded that since its gender-based classification was substantially related to an important government objective, it passed constitutional muster. Nowhere did the Court cede to Congress the authority to determine the appropriate remedy for its earlier violations.

underinclusive scheme ... [either by] 'declar[ing] the [statute] a nullity and order[ing] that its benefits not extend to the class that the legislature intended to benefit, or ... [by] extend[ing] the coverage of the statute to include those who are aggrieved by the exclusion.'" *Mathews*, 465 U.S. at 738, 104 S.Ct. at 1394–95 (quoting *Welsh v. United States*, 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring)) "[W]hen the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Id.* at 740, 104 S.Ct. at 1395 (quoting *Iowa–Des Moines National Bank v. Bennett*, 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265 (1931) (Brandeis, J., writing for the Court) (emphasis omitted)).

No one has suggested here that Section 1993's failure to accord female citizens the same rights as male citizens to bestow citizenship on their children be remedied by invalidating the statute, thereby stripping citizenship from the foreign-born offspring of male citizens. However, the government argues that the district court lacked the authority to pursue the alternative course of extending the statute's benefits to citizen mothers such that their foreign-born children would also become citizens. While expansion of the statute's coverage in this manner would appear to represent an accepted means of redressing the statute's underinclusiveness, the government contends that under no circumstances can courts confer the privilege of citizenship where Congress has not explicitly authorized them to do so.

The United States looks to the Supreme Court's decision in *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), for support for this proposition. In *Pangilinan*, the Court rejected the claims of sixteen Filipino nationals who had served in the United States Armed Forces during World War II, and who contended that they were entitled to United States citizenship under the terms of a statute that had expired several decades prior to the filing of their petitions for naturalization. The statute exempted aliens who had fought for American forces from fulfilling various prerequisites to naturalization, and authorized immigration officials to conduct naturalization proceedings outside of the United States. It further declared that those aliens wishing to take advantage of its provisions had to file a naturalization petition prior to December 31, 1946.

The *Pangilinan* plaintiffs had not complied with this deadline. However, they contended that because no immigration official was present in the Philippines to act upon naturalization petitions from October 1945 to August 1946, they remained entitled to file for citizenship after the deadline had passed. Our court agreed. We found the Attorney–General's failure to make immigration officials available in the Philippines for a nine-month period to have been in violation of the statute, and deemed the naturalization of the plaintiffs an appropriate equitable remedy.

The Supreme Court reversed. It first noted that because the plaintiffs had filed their naturalization petitions after December 31, 1946, they did not enjoy a statutory right to citizenship. It then rejected our court's holding that the conferral of citizenship was nevertheless proper as an equitable remedy for the government's failure to comply with the terms of the naturalization statute. The Court observed that Congress has narrowly prescribed the judiciary's statutory authority to deem individuals citizens of the United States. "[T]he power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers. See, e.g., 28 U.S.C. § 1361; 28 U.S.C. § 1651. Rather, it has been given them as a specific function to be performed in strict compliance with the terms of an authorizing statute which says that '[a] person may be naturalized ... in the manner and under the conditions prescribed in this subchapter, *and not otherwise*.' 8 U.S.C. § 1421(d) [emphasis supplied by *Pangilinan* Court] ... Neither by application of the doctrine of estoppel, nor

by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [statutory] limitations." *Pangilinan,* 486 U.S. at 883–85, 108 S.Ct. at 2216–17.

The United States draws too much from the *Pangilinan* Court's holding. The Court's holding precludes the judiciary from exercising its statutory powers of naturalization to redress *statutory* violations except in strict conformity with Congress' authorizing legislation. It does not speak to the courts' capacity to utilize traditional constitutional remedies to rectify *constitutional* violations. The United States reads *Pangilinan* to bar the courts from redressing constitutionally underinclusive statutes by extending their benefits to a disfavored class where the benefits in question are those of citizenship. *Pangilinan* does not support such a sweeping proposition.

Immediately after its discussion of the judiciary's narrow statutory powers to naturalize citizens, the *Pangilinan* Court addressed the plaintiffs' constitutional claims. The plaintiffs asserted that the lack of availability of an immigration officer in the Phillipines to receive their applications for citizenship had deprived them of their rights under the Fifth Amendment's due process clause and its equal protection component. Had the Court perceived the judiciary to be incapable of conferring citizenship to remedy a constitutional violation, it could have disposed of these claims without reaching their merits, just as it had dismissed the plaintiffs' statutory argument. We find it significant that the Court addressed the substance of both the due process and equal protection claims, and nowhere indicated that it considered the courts' limited statutory authority to be a restriction on their ability to redress constitutional violations.

Thus, we reject the United States' position that by recognizing the judiciary's narrow statutory powers with respect to citizenship, the *Pangilinan* Court carved out

an exception to the traditional authority of the courts to remedy equal protection violations by extending the benefits of a discriminatory statute to a disfavored class. In this court's first post-*Pangilinan* decision, we interpreted *Pangilinan* to stand for the proposition that "[a]bsent a showing of ... a constitutional violation, [a] district court ha[s] no authority to ... grant [a] naturalization petition pursuant to its powers of equity." *Ortega v. United States,* 861 F.2d 600, 603 (9th Cir.1988). Today's holding follows the precedent of *Pangilinan* and *Ortega.* We agree with the district court that it has the authority to redress Section 1993's impermissible gender-based discrimination by extending to citizen mothers the same rights as those possessed by citizen fathers to transmit their citizenship to their children born before 1934.[7]

## VI.

The district court properly declared plaintiffs Valerie Wauchope and Ellen Kinahan citizens of this country.

AFFIRMED.

POOLE, Circuit Judge, dissenting:

I respectfully dissent. While I sympathize with the majority's desire to fashion the remedy it did, I believe that remedy has been forbidden us by *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). There, the Supreme Court spoke plainly when it said: "Once it has been determined that a person does not qualify for citizenship, ... the district court has no discretion to ignore the defect and grant citizenship." *Id.* at 884, 108 S.Ct. at 2216 (internal quotation marks omitted; quoting *Fedorenko v. United States,* 449 U.S. 490, 517, 101 S.Ct. 737, 752–53, 66 L.Ed.2d 686 (1981)). We are simply not empowered to confer citizenship as a remedy.

---

7. Under Section 1993, only citizen fathers who had resided in this country (for any length of time) could transmit their citizenship to their foreign-born children. Both plaintiffs' mothers were born here.

I would reverse the district court's decision.