MINNESOTA MINING AND
MANUFACTURING
CO., Plaintiff,

v.

BEAUTONE SPECIALTIES, CO.,
LTD., and Taiwan Hopax Chemi-
cals Mfg. Co. Ltd., Defendants.

No. Civ 98–709 DSD/JMM.

United States District Court,
D. Minnesota.

Jan. 3, 2000.

998

Louis T. Pirkey, William G. Barber, Mark A. Thurmon, Arnold, White & Durkee, Austin, TX, Timothy M. Kenny, Arnold, White & Durkee, Minneapolis, MN, Michael V. Ciresi, Rita C. DeMeules, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, Robert W. Hoke II, Terryl K. Qualey, Carolyn V. Peters, 3M Company, St. Paul, MN, for plaintiff.

Robert W. Turner, Scott W. Burt, Mark N. Reiter, Jones, Day, Reavis & Pogue, Dallas, TX, David A. Allgeyer, Sally J. Whiteside, and Lindquist & Vennum, Minneapolis, MN, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on defendants' motion for summary judgment. Based on a review of the file, record, and proceedings herein, the court grants defendants' motion in part and denies it in part.

## DISCUSSION

This case arises out of a trademark dispute between rival sticky note manufacturers, plaintiff Minnesota Mining and Manufacturing, Inc. ("3M") and defendants Beautone Specialties Co., Ltd ("Beautone") and Taiwan Hopax Chemicals Mfg. Co. Ltd. ("Hopax"). Beautone is a subsidiary of Hopax. In the late 1970s, 3M created a brand of sticky notes under the trademark POST–IT. Since introducing POST–IT notes into the market, 3M has continuously produced them in a shade of pastel yellow that the company calls "canary yellow." Throughout the 1980s, consumer demand for sticky notes grew rapidly. By 1986, 3M was facing competition from other sticky note manufacturers, including defendants, who produced their sticky notes in a pastel yellow shade. In April 1996, 3M applied to the U.S. Patent and Trademark Office to register the color canary yellow as a trademark for sticky notes. In February 1998, after defendants opposed 3M's registration, 3M sued Beautone in this court for trademark infringement, trademark dilution, unfair competition, and unjust enrichment. 3M later amended its complaint to include Hopax as a defendant. Defendant Beautone has counterclaimed against 3M for declaratory judgment. After a period of discovery and several pretrial motions, defendants now bring a motion for summary judgment on grounds of trademark invalidity, laches, and equitable estoppel.

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548.

### B. What Is "Canary Yellow"?

As a threshold matter, the court must address a core definitional question: What is "canary yellow"? The answer will control several key aspects of this case, including the issues of functionality and secondary meaning. The broader the range of color claimed by 3M, the more likely it is that the factfinder will conclude that the requested trademark protection would foreclose competitors from access to a functional product feature. *See infra* Part C.1 (examining issue of functionality). *Cf. Master Distributors, Inc. v. Pako Corp.*,

986 F.2d 219, 222 (8th Cir.1993) ("We agree that allowing a manufacturer to monopolize red 'in all of its shades' would deplete the color choices available to other market participants."). Further, the broader the range of color claimed by 3M, the less likely it is that the factfinder will conclude that "canary yellow" has become a distinctive symbol of the 3M POST–IT Note. *See infra* Part C.2 (examining issue of distinctiveness).

Defendants contend that 3M has laid claim to all competitively viable pastel yellows available to sticky note manufacturers, including the shade of light canary yellow 3M uses to produce its budget line of sticky notes, HIGHLAND. However, the court does not construe 3M's trademark claim so broadly. In its amended complaint, 3M states that "the particular shade of yellow" at issue here "range[s] from the original yellow color of POST–IT repositionable notes to a darker, brighter yellow," a range that apparently does not include the light canary yellow used in the HIGHLAND product. 3M Complaint ¶ 13. Indeed, one of 3M's own witnesses, the business unit director at Georgia–Pacific, which produces the yellow paper used by 3M in both its POST–IT and HIGHLAND products, expressly distinguished the two yellow shades:

> 3M buys two pastel yellow papers from [Georgia–Pacific]. We call these colors canary and light canary, although, to my knowledge, these names do not reflect any accepted industry standard concerning the names of pastel yellow papers. 3M uses the canary yellow paper to make its [POST–IT] Notes and the light canary yellow to make its [HIGHLAND] Notes.

Decl. of William J. Smith ¶ 6. 3M has also acknowledged that the range of yellow identified by defendants' own expert witness as competitively viable "includes yellow shades darker than 3M's canary yellow and shades that are lighter than 3M's canary yellow." Pl.'s Response Memo. at 1. *See also id.* at 4 ("Many alternative colors

are available to Defendants, including other shades of yellow.").[1]

For purposes of this motion, then, the court will assume that canary yellow is a relatively narrow band of color falling somewhere between the HIGHLAND light canary yellow and the darkest and brightest shades of competitively viable yellow. Before trial, however, the court expects the parties to arrive at a more specific definition of "canary yellow." Ideally, this definition would take both graphical and numerical form. *See* McCarthy on Trademarks and Unfair Competition § 7:42 ("There do exist scientifically accurate methods for objectively defining a color shade, whether or not a human eye can distinguish them."). Such a definition will greatly aid the factfinder in evaluating the merits of 3M's claims. It will also assist the court in fashioning an appropriate equitable remedy in the event that 3M prevails. If the parties cannot stipulate to a color definition, the court would be willing to entertain a pretrial motion by either party on the issue.

## C. Trademark Validity

 Defendants seek summary judgment on 3M's claim that it has a valid trademark in the color canary yellow. Under the Lanham Act, trademarks "includ[e] any word, name, symbol, or device, or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. In 1995, the Supreme Court, resolving a split among the circuit courts, held that there is no per se prohibition against the use of color as a trademark. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). *Compare In re Owens–Corning Fiberglas Corp.*, 774 F.2d 1116, 1128 (Fed.Cir.1985) (permitting registration of color as trademark), *and Mas-*

---

**1.** 3M made a similar assurance to the court at oral argument.

*ter Distributors*, 986 F.2d at 224 (holding that there is no per se rule prohibiting protection of color alone), *with NutraSweet Co. v. Stadt Corp.*, 917 F.2d 1024, 1028 (7th Cir.1990) (holding that color alone may not receive trademark protection). The Court made clear, however, that the claimed color must still "meet the basic legal requirements" for trademark protection: (1) the color must not be functional and (2) the color must have acquired distinctiveness through secondary meaning. *Qualitex*, 514 U.S. at 174, 115 S.Ct. 1300.[2] The burden is on 3M to prove each of these elements by a preponderance of the evidence. *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir.1994).

## 1. Functionality

■ Defendants contend that 3M is attempting to appropriate a functional aspect of the sticky note product by obtaining trademark protection for canary yellow. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164, 115 S.Ct. 1300. Under the functionality standard articulated by the Court in *Qualitex*, " 'a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' " that is, if "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Id.* at 165, 115 S.Ct. 1300 (quoting *Inwood Labs., Inc. v. Ives Labo-*

*ratories*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). *See also Master Distributors*, 986 F.2d at 224 ("[T]he functionality doctrine ... provides that if a color is essential to the utility of a product or is the natural color of the product, then no party may acquire exclusive trademark rights in that feature or color."); *Owens–Corning*, 774 F.2d at 1120–21 ("As with utilitarian features in general, when the color applied to goods serves a primarily utilitarian purpose it is not subject to protection as a trademark.").

■ Both parties appear to agree that the availability of similarly beneficial alternative colors is the critical consideration in determining whether canary yellow is functional or not. *See* Defs.' S.J. Memo. at 9; Pl.'s Response Memo. at 4. *See also* Restatement (Third) of Unfair Competition § 17, cmt. b. ("[A] product feature is not functional merely because the feature serves a utilitarian purpose. The recognition of trademark rights is precluded only when the particular design affords benefits that are not practically available through alternative designs."). Defendants contend that, in the context of the sticky note market, canary yellow is superior to other alternative colors under a number of functional criteria: cost, legibility, conspicuity, eyestrain reduction, gender-neutrality, aesthetic preference, photocopying. On the other side, however, 3M argues that many of the functions asserted by defendants are not relevant to consumer demand for sticky notes.[3] And with respect to those functions that 3M agrees are relevant, 3M has introduced evidence that ca-

---

**2.** In *Qualitex*, the Court suggested that colors are not "inherently distinctive" and may acquire distinctiveness only through secondary meaning. *See* 514 U.S. at 163, 115 S.Ct. 1300.

**3.** In arguing that eyestrain reduction, gender-neutrality, photocopying, and aesthetic preference are pertinent factors, defendants rely on pre-litigation statements made the inventor of POST–IT Notes, Art Fry, as he performed publicity work for 3M. However, on summary judgment, it is appropriate to take Fry's earlier statements in the spirit he now asserts he

made them: "Once you have decided on a color, then you want to sell that color afterwards, and so those [alleged functional benefits] become talking points afterward—after the fact more than at the time the decision was made." Fry Dep. at 36. In any event, as the Supreme Court suggested in *Qualitex*, the ultimate question is not what 3M subjectively believed about canary yellow's functionality at the time it selected the color but whether canary yellow truly offers sticky note producers a significant non-reputation-related competitive advantage. *See* 514 U.S. at 164–65, 168–70, 115 S.Ct. 1300.

nary yellow provides no special benefit. For example, 3M has introduced expert testimony that canary yellow is no more conspicuous or legible than a host of other colors, including lighter and darker shades of yellow. Indeed, defendants' own expert has concluded that there is a wide band of "competitively viable yellow," only part of which constitutes the canary yellow shade 3M seeks to trademark. *See* Charles P. Klass, *The Competitive Advantages of Pastel Yellow Paper in the Sticky Notes Market*, Ex. I (Aug. 2, 1999). 3M has also produced evidence suggesting that the price advantage enjoyed by canary yellow paper in the market for sticky note paper is caused by the volume-driven discounting practices and production efficiencies of paper manufacturers, not by any specific cost savings inherent in canary yellow paper.

Defendants cite to several circuit court decisions that, they contend, demonstrate the high hurdle a party faces in attempting to prove that a single color is nonfunctional. *See Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527, 1531 (Fed.Cir. 1994) (color black functional because of its color-compatibility and because it gives engines a smaller appearance); *Deere & Co. v. Farmhand*, 721 F.2d 253, 253 (8th Cir. 1983) (per curium) ("John Deere Green" functional because of consumer's aesthetic preference).[4] There is, however, a significant procedural difference between those cases and the present one. In *Brunswick* and *Deere*, the appellate courts reviewed the functionality findings below under the clearly erroneous standard. Here, however, under Rule 56, the court must look at the evidence in the light most favorable to 3M.

In the summary judgment context, the controlling precedent is *Master Distributors, Inc. v. Pako Corp.*, 986 F.2d 219 (8th Cir.1993). In *Master Distributors*, plain-tiff brought a trademark infringement suit, asserting trademark rights in the blue color of its leader splicing tape. The district court granted defendants summary judgment on the ground that permitting plaintiff to trademark the blue color would unduly deplete the pallette of useful colors available to competitors. The Eighth Circuit reversed:

> Proponents of the color depletion theory assert that there are only a few possible colors a manufacturer can choose for a product, and allowing one manufacturer to monopolize one color "in all its shades" will inhibit competition. We agree that allowing a manufacture to monopolize red "in all of its shades" would deplete the color choices available to other market participants. Allowing a manufacturer who has met all the normal requirements for obtaining trademark protection to protect a specific shade of color, however, is another matter.... [A] manufacturer's mere use of a certain color will not automatically grant it proprietary rights—the manufacturer must establish all the normal requirements for trademark protection, including secondary meaning. Until secondary meaning has been established in every distinguishable shade of color and in no color at all, a highly improbable situation, there will always be an option available to a new market entrant.

*Id.* at 223. With these principles in mind, the Eighth Circuit concluded that summary judgment was inappropriate at "this early stage" of the litigation, where there remained factual disputes as to the extent of color foreclosure and its effect on other market participants. *Id.* at 225.

The reasoning in *Master Distributors* applies with equal force to this case. De-

---

4. Defendants also cite to *Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402 (2d Cir.1997), in support of the proposition that functionality exists when the consumer comes to associate the color at issue with a particular type of goods. However, *Forschner* does not address the issue of color functionality; it addresses the issue of color distinctiveness. *See id.* at 408 (under abuse of discretion standard, holding that district court had properly found that the color red lacked distinctiveness in pocket knife market, where red-handled "Swiss Army" knives had been manufactured by several companies over many years).

fendants argue that there is a competitive need to use canary yellow in manufacturing sticky notes and that allowing 3M to appropriate the canary yellow shade would inhibit market competition. 3M has introduced evidence, however, that any number of colors perform the job as well as or better than canary yellow and that protecting canary yellow via trademark law will foreclose defendants from nothing other than their ability to trade on the good reputation of the 3M POST–IT brand. With these material facts left unresolved, the question of canary yellow's functionality is not amenable to summary judgment.

### b. Secondary Meaning

▮ Defendants also contend that 3M has not met its burden of demonstrating that canary yellow has acquired distinctiveness by virtue of secondary meaning. To prove secondary meaning, 3M must show that, in the minds of the public, the primary significance of canary yellow is to identify 3M as the source of the sticky note. *See Inwood Labs.*, 456 U.S. at 851 n. 11, 102 S.Ct. 2182; *Aromatique*, 28 F.3d at 871 ("In determining whether there is secondary meaning, 'the chief inquiry is whether in the consumer's mind the mark has become associated with a particular source.'") (quoting *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1332–33 (8th Cir.1985)). In addition, 3M must prove that canary yellow acquired this secondary meaning prior to the date that defendants began using the color. *See Co–Rect*, 780 F.2d at 1330. The types of evidence relevant to the question of secondary meaning include: (1) customer surveys; (2) exclusivity, length, and manner of use; (3) amount and type of advertising; (4) media coverage; (5) sales volume and market share. *Aromatique*, 28 F.3d at 871.

▮ Here, 3M has produced substantial evidence of secondary meaning. First, 3M has introduced survey evidence supporting the conclusion that consumers strongly associate canary yellow sticky notes with 3M and the POST–IT product. Second, 3M has shown that for the first four or five years POST–IT Notes were on the market, 3M was the exclusive seller of canary yellow sticky notes in the office supply market. Third, 3M has demonstrated that between 1980 and 1986 3M mounted large-scale advertising and media campaigns prominently featuring the canary yellow color of the POST–IT Note product. Fourth, 3M has shown that, throughout the early 1980s, canary yellow POST–IT Notes possessed the kind of commanding market share that might support an inference of secondary meaning. While defendants sharply dispute the weight of this evidence, the court concludes that 3M has created a genuine issue of fact as to the secondary meaning of canary yellow.

### D. Laches and Equitable Estoppel

Absent the court's dismissal of 3M's suit on the merits, defendants move the court for summary judgment on their laches and equitable estoppel defenses. The court will discuss each in turn.

### 1. Application of Laches

▮ "The equitable doctrine of laches is derived from the maxim that those who sleep on their rights, lose them." *Hot Wax, Inc., v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir.1999). To prevail on its laches defense, defendants must demonstrate by a preponderance of the evidence (1) that 3M inexcusably delayed in asserting its trademark claim and (2) that defendants suffered undue prejudice because of that delay. *See Hubbard Feeds v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir.1999) (setting forth elements of laches); *Azalea Fleet v. Dreyfus Supply & Mach. Corp.*, 782 F.2d 1455, 1458 (8th Cir.1986) (stating that the burden of proving laches rests on the party opposing the trademark claim).

### a. Inexcusable Delay

▮ 3M does not dispute that it waited almost twelve years, measured from the time it became aware that defendants began manufacturing canary yellow

sticky notes, before bringing the present suit. This time period, almost twice that of the relevant state statute of limitations, *see* Minn.Stat. § 541.05, is strong evidence that 3M's delay was unreasonable. *See Reynolds v. Heartland Transp.*, 849 F.2d 1074, 1075 (8th Cir.1988) ("[T]he period prescribed in an analogous statute of limitation is a rough rule of thumb in considering the question of laches, and constitutes a pertinent factor in evaluating the equities."). 3M does, however, offer an excuse: until the U.S. Supreme Court handed down the *Qualitex* decision in 1995, the company did not believe that color alone could be protected under the trademark laws. 3M cites to several cases holding that a sudden change in an unfavorable law can justify even a lengthy delay in bringing suit. *See, e.g., Wauchope v. United States Dept. of State*, 985 F.2d 1407, 1411–12 (9th Cir.1993).

The problem with 3M's proffered excuse is that *Qualitex* did not mark a sudden change in trademark law. Rather, the Supreme Court, in a unanimous decision, placed its imprimatur on federal appellate decisions that, years before, would have had highly persuasive or controlling weight in this court. In 1985, a year before defendants began offering their yellow sticky note products on the market, the Federal Circuit handed down *In re Owens–Corning Fiberglas Corp.*, holding that a single color may receive trademark protection. And in 1993, the Eighth Circuit issued *Master Distributors*, which also held that color alone could be protected. As the court stated in *Master Distributors*, "[e]ven before *Owens–Corning* ... some courts were protecting color marks on a showing of secondary meaning" and "neither the United States Supreme Court nor this Court has ever per se prohibited the protection of color as a trademark." Indeed, as early as 1983, Eighth Circuit caselaw appeared to acknowledge the legal possibility that color alone could be protected. *See Deere & Co. v. Farmhand, Inc.*, 721 F.2d 253,

253 (8th Cir.1983) (per curium) (affirming lower court decision that had addressed the merits of the trademark validity of "John Deere Green").[5] Even with this favorable authority in back of it, however, 3M refrained from initiating a trademark action against defendants until after *Qualitex*. That 3M may have had tactical reasons for awaiting a Supreme Court ruling on the issue of color trademarks does not make its conduct excusable. "One cannot sit back, wait for years for someone else to act as his stalking horse, and then ride the coattails of a favorable decision irrespective of the delay involved." *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1259 (3d Cir., 1974).

### b. Prejudice

Defendants have also demonstrated that they suffered significant prejudice because of 3M's inexcusable delay. Since 1986, defendants have spent millions of dollars manufacturing and promoting their yellow sticky note products in the United States. Further, defendants have exposed themselves to substantial potential legal liability, in the form of treble damages and loss of profits, that they would not have faced if they had produced a different color-sticky note. This clear showing of economic prejudice, not disputed by 3M with specific evidence, is more than sufficient to meet the prejudice requirement of laches. *See, e.g., Hot Wax*, 191 F.3d at 824 ("The market position pursued by [defendant] with respect to the products at issue was uncontested by [plaintiff] for years.... Had [plaintiff] successfully pressed its claims in a timely manner, [defendant] certainly could have invested its time and money in other areas or simply renamed the product."); Restatement (Third) of Unfair Competition § 31 cmt. a (stating that inexcusable delay can "prejudice the defendant by increasing the amount of plaintiff's loss"). *See also Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 807 (8th Cir.

---

**5.** Moreover, as the Supreme Court pointed out in *Qualitex*, by 1986, the Patent and Trademark Office had adopted a policy allowing registration of color as a trademark. *See* 514 U.S. at 172, 115 S.Ct. 1300.

1979) ("[I]f the [plaintiff's] delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required.").

In sum, defendants have convincingly demonstrated that 3M's delay in pursuing trademark protection was inexcusable and that they suffered undue prejudice because of that delay. Accordingly, the court will grant defendants' partial summary judgment on their laches defense.[6]

### 2. Effect of Laches

■■■■■ The general rule is that a finding of laches bars a plaintiff's ability to recover for past wrongs, but not a plaintiff's ability to obtain relief for continuing violations. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1040 (Fed.Cir.1992) (en banc). Defendants contend, however, that the circumstances surrounding this case are sufficiently egregious to bar all relief. *Id.* (pointing out the "egregious circumstances" exception, in non-patent cases, to the general rule). The court disagrees. Since 3M filed its complaint in 1998, the equitable calculus in this case has changed significantly. *See Reynolds v. Heartland Transp.*, 849 F.2d 1074, 1075 (8th Cir.1988) ("Laches is an equitable doctrine and the courts will " 'examine all aspects of the equities affecting each case.' " (citation omitted)). 3M is no longer delaying and defendants can no longer claim the same degree of undue economic prejudice, having decided to continue marketing their yellow sticky notes even in the face of 3M's trademark suit. Indeed, because a finding of liability in this case would be premised on a finding that the canary yellow shade provides no significant non-reputation-related competitive advantages, defendants would be hard-

pressed to show any unfair economic prejudice in being enjoined from producing a canary yellow sticky note.[7] Most important, however, is the continuing risk that the public will be confused by defendants' use of canary yellow. The court can identify no circumstance here serious enough to outweigh the public interest in stopping what may be an ongoing violation of the trademark laws. Accordingly, the court's laches ruling bars 3M only from receiving damages and profits for the period prior to the filing of this suit. 3M may still receive (1) injunctive relief against continuing trademark violations and (2) damages and profits for the post-filing period.

### 3. Equitable Estoppel

■■■■■ Defendants also contend that 3M's suit should be barred under the doctrine of equitable estoppel. To prevail on its estoppel defense, defendants must show that (1) they were misled by 3M's conduct to believe that 3M did not intend to enforce its trademark against defendants, (2) that defendants relied on that conduct, and (3) that defendants will be materially prejudiced if 3M is permitted to enforce its trademark rights. *See Aukerman*, 960 F.2d at 1041; *see also Bostwick Irrigation Dist. v. United States*, 900 F.2d 1285, 1291 (8th Cir.1990) ("[B]efore an estoppel arises a party must make a misrepresentation or take an action with reason to believe that the other party will rely upon it."). Misleading conduct may include specific statements, action, inaction, or silence where there was an obligation to speak. *See id.* at 1028. However, silence or inaction must be combined with other facts surrounding the relationship or contacts between the parties to support an inference

---

**6.** 3M argues that laches may not operate against its trademark dilution claims because they are based on state and federal statutes that were not enacted until the mid–1990s. However, a Minnesota common law dilution claim has been available to plaintiffs for many years. *See De Rosier v. 5931 Business Trust*, 870 F.Supp. 941, 948 (D.Minn.1994); *Scott v. Mego Int'l, Inc.*, 519 F.Supp. 1118 (D.Minn. 1981). Thus, laches properly applies to 3M's

dilution claims as well. Nonetheless, the court notes that the primary remedy available under the state and federal dilution statutes is injunctive. As stated below, the court's laches ruling here does not bar 3M from obtaining injunctive relief against defendants.

**7.** In addition, defendants have not identified any significant evidentiary prejudice they have suffered because of 3M's delay.

that the claim against the alleged infringer has been abandoned. *See id.* at 1042; *Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1295 (Fed.Cir.1992).

 Defendants have failed to demonstrate any misleading conduct on the part of 3M. Defendants point to a series of advertisements by 3M stating, for example, that "[i]t seem like all kinds of companies out there are introducing little yellow sticky pads these days" but that the consumer should "look for the words 'POST–IT' on the back of each sheet." *See* Scherr Decl., Exh. 56. Defendants contend that these advertisements served as tacit invitations to 3M's competitors that they could produce yellow sticky notes. If anything, however, these advertisements signaled that 3M was concerned that consumers were confused about the source of the various yellow sticky notes on the market, precisely the allegation that is driving the present lawsuit. Further, defendants have offered no evidence that they relied on these advertisements when they made their business decisions to produce yellow sticky notes. Accordingly, the court must deny defendants' motion for summary judgment on the issue of equitable estoppel.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment on the issue of trademark validity is denied.

2. Defendants' motion for summary judgment on the issue of equitable estoppel is denied.

3. Defendants' motion for summary judgment on the issue of laches is granted in part. 3M is barred from receiving damages and profits for the period prior to the filing of this suit.