**Aurora AGUAYO, Plaintiff,**

v.

**Warren CHRISTOPHER, Secretary of State, Defendant.**

**No. 92 C 7535.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 26, 1994.

Cheryl L. Lenz–Calvo, Kempster & Associates, David Rubman, Law Office of David Rubman, Chicago, IL, for plaintiff.

James G. Hoofnagle, U.S. Attorney's Office, Chicago, IL, for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

Both parties have moved for summary judgment. For the reasons stated in this opinion, the court grants summary judgment in favor of plaintiff and denies the defendant's motion. The court will issue a declaratory judgment stating the plaintiff Aurora Aguayo is a citizen of the United States.

## FACTUAL AND LEGAL BACKGROUND

Plaintiff Aurora Aguayo was born October 4, 1926, in Mexico. Her mother, Hilaria Perez, had been born in the United States in 1909. Plaintiff's father was a native and citizen of Mexico, where he died in 1930. Not long after World War II, plaintiff's mother came to live in the United States, although plaintiff did not follow until 1962, at the age of 35. Plaintiff has lived in this country ever since. In 1992, she applied for a U.S. passport and was denied on the ground that she was precluded from derivatively acquiring citizenship from her mother under § 1993 of the Revised Statutes of 1874. Plaintiff then filed this lawsuit against the defendant ("the Government") challenging the constitutionality of § 1993 and seeking to have herself declared a United States citizen. Section 1993 provided:

> All children heretofore born or hereafter born out of the limits and jurisdiction of the United States whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

Revised Statutes of 1874, § 1993. The law was enacted in response to scholarly concerns that its predecessor statute granted citizenship to only the foreign-born children of persons who were U.S. citizens on or before April 14, 1802, and not to foreigners whose parents had become citizens after that date. *See Montana v. Kennedy,* 366 U.S. 308, 311, 81 S.Ct. 1336, 1338, 6 L.Ed.2d 313 (1961). Section 1993 covered children "heretofore" or "hereafter" born abroad, but only those born of citizen *fathers. Id.* The statute did not grant citizenship to foreign-born persons who had a citizen mother but an

alien father. *Id.* Congress amended the statute in 1934 to include this class of children of citizen mothers, but the amendment had only prospective effect. *Id.* at 312, 81 S.Ct. at 1339. As a result, persons such as Aguayo, who was born abroad of a citizen mother and alien father before 1934, remain under § 1993 and are not entitled to acquire U.S. citizenship derivatively from their mothers, at least as a matter of statutory construction. *Id.* The *Montana* Court was not confronted with a constitutional challenge to the facial terms of § 1993. In fact, neither the parties nor the court has encountered any instance in which the United States Supreme Court has had occasion to evaluate the question of whether § 1993 unconstitutionally discriminates against citizen mothers and their offspring.

Federal appellate courts have twice passed on this question. In *Villanueva–Jurado v. INS,* 482 F.2d 886 (5th Cir.1973), the Fifth Circuit upheld the statute without extensive discussion or analysis, noting the "free hand" of Congress in determining the citizenship of foreign-born persons. *Id.* at 887 (citing *Hein v. INS,* 456 F.2d 1239, 1240 (5th Cir.1972)). The *Villanueva–Jurado* court also cited prior Supreme Court precedent to the effect that persons born abroad of a citizen mother prior to 1934 had no claim to citizenship under § 1993, but the cited cases concerned only the statute's construction, and not its facial constitutionality. *Villanueva–Jurado,* 482 F.2d at 888 (citing *Rogers v. Bellei,* 401 U.S. 815, 826, 91 S.Ct. 1060, 1066, 28 L.Ed.2d 499 (1971), and *Montana,* 366 U.S. at 311–12, 81 S.Ct. at 1338–39.) More recently, the Ninth Circuit in *Wauchope v. United States Dep't of State,* 985 F.2d 1407 (9th Cir.1992), confronted just such an argument, which parallels the one Aguayo makes in this case. In *Wauchope,* the Ninth Circuit held that § 1993 violates the constitutional guarantee of equal protection to citizen mothers of persons born abroad prior to 1934, that the foreign-born children have standing to assert their mothers' rights, and that federal courts possess the equitable power to remedy the constitutional violation by declaring the children citizens. *Id.* at 1412–18.

A handful of lower federal courts have reached differing results. *Compare United States v. Breyer,* 829 F.Supp. 773, 781 (E.D.Pa.1993) (following *Wauchope* to find § 1993 unconstitutional); *United States v. Breyer,* 841 F.Supp. 679, 685–87 (E.D.Pa. 1993) (declaring that the pre–1934 foreign-born children of citizen mothers are entitled to citizenship and advising plaintiff to "pursue his claim of citizenship by birth through the appropriate administrative channels"); and *Elias v. United States Dep't of State,* 721 F.Supp. 243, 249–50 (N.D.Cal.1989) (holding that § 1993 unconstitutionally discriminated against citizen mothers, whose offspring had standing to raise constitutional claims), *with Tranter v. Secretary of State,* No. 92–1565, 1994 WL 289358, at *2 (D.D.C. May 17, 1994) (declining to reach constitutionality of § 1993 and granting summary judgment to Government on ground of plaintiff's lack of standing, in that foreign-born child's injury was not redressable because district court lacked power to confer citizenship) and *Miller v. Christopher,* No. 93–1182, slip op. at 5 (D.D.C. April 29, 1994) (rejecting, on same standing ground raised in *Tranter,* plaintiff's constitutional challenge to federal statute concerning naturalization of illegitimate foreign-born children of citizen fathers).

The *Tranter* and *Miller* courts based their holdings largely on *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), in which the Supreme Court discussed the limitations on federal courts' power to grant citizenship. In this case, the Government relies heavily on *Pangilinan* for its argument that Aguayo has no standing to sue for the putative constitutional wrong because Aguayo's injury is not redressable by the courts. Aguayo responds that this court should follow the lead of the Ninth Circuit in *Wauchope,* which limited *Pangilinan* to litigants who were deprived of citizenship by statutory, rather than constitutional, violations. The Government argues further that even if Aguayo can clear the standing hurdle, § 1993 is constitutional under the deferential standard of review federal courts have applied to immigration legislation pursuant to *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). Finally, the Government contends that Aguayo's lawsuit should be barred by the doctrine of laches.

# 483

## ANALYSIS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This case appears to be particularly appropriate for summary judgment. The material facts are undisputed, leaving only the legal question of whether Aguayo is entitled to the relief she seeks.

### I. Standing

■■■ The doctrine of standing concerns whether the litigant may have the court decide the particular disputed issues, and it "'involves both constitutional limitations on federal court jurisdiction and prudential limits on its exercise.'" *Indemnified Capital Investments v. R.J. O'Brien & Assoc., Inc.*, 12 F.3d 1406, 1408 (7th Cir.1993) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975)). Article III of the Constitution limits the power of federal courts to the resolution of "cases" and "controversies." U.S. Const. art. III; *Foster v. Center Township of LaPorte County*, 798 F.2d 237, 240–41 (7th Cir.1986).

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d

351 (1992) (citations omitted). Once a litigant satisfies the constitutional elements of standing, the prudential elements remain. *Indemnified Capital Investments*, 12 F.3d at 1410 (citing *Singleton v. Wulff*, 428 U.S. 106, 113, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976)). These prudential limitations generally require litigants to assert their own legal rights and not those of third parties, except where (1) the litigant has suffered an "injury-in-fact," thus giving rise to a "sufficiently concrete interest" in the outcome of the issue in dispute; (2) the litigant has a close relation to the third party, so that the litigant is "fully, or very nearly as effective a proponent of the right" as the third party; and (3) there is some hindrance to the third party's ability to protect his or her own interests. *Powers v. Ohio*, 499 U.S. 400, 409–12, 111 S.Ct. 1364, 1370–72, 113 L.Ed.2d 411 (1991) (quoting *Singleton*, 428 U.S. at 112, 115, 96 S.Ct. at 2873, 2874).

### A. Prudential Standing Limits

It should be noted that in *Wauchope*, the Ninth Circuit disposed of the Government's standing argument without a searching analysis of standing's constitutional components. *Wauchope*, 985 F.2d at 1410–11. The *Wauchope* court stated only that the Government's interpretation of § 1993 operated to deny the plaintiffs citizenship, and "[t]his showing of injury suffices to meet constitutional standing concerns." *Id.* The Ninth Circuit then went on to hold that the plaintiffs met the prudential requirements of standing, *id.* at 1411, and there would seem to be hardly any dispute in *Wauchope* or here that a person denied citizenship for being born abroad of a citizen mother, prior to 1934, can sufficiently allege an injury-in-fact, a close relation to the citizen mother, and some hindrance to the (deceased) mother's pursuit of the claim.

■■■ Moreover, Aguayo's lawsuit should properly be viewed as asserting Aguayo's equal protection rights as well. Although § 1993 applies equally to men and women who were born of citizen mothers prior to 1934, it still disfavors the children of citizen mothers by denying them the benefit it confers on similarly situated children who differ

only in that the citizen parent happened to be the father. A statute with a facially discriminatory classification is not saved from judicial review because it applies equally to men and women within the class. *See Loving v. Virginia,* 388 U.S. 1, 8–9, 87 S.Ct. 1817, 1821–22, 18 L.Ed.2d 1010 (1967). In *Loving,* the Supreme Court invalidated a state statute barring interracial marriages. The statute applied equally to men and women, white and black, but the Court stated that "we reject the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations.... [T]he fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race." *Id.* In reaching its holding, the Court in *Loving* referred to marriage as "one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Id.* at 12, 87 S.Ct. at 1823 (quoting *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)). In the present case, the Government asserts that Aguayo can have no constitutional claim because an alien's right to derive citizenship from a citizen parent is grounded in federal statutes, and not the constitution. *See Rogers v. Bellei,* 401 U.S. 815, 830, 91 S.Ct. 1060, 1068, 28 L.Ed.2d 499 (1971).

 But this argument misapprehends the nature of Aguayo's constitutional claim. Even though the Constitution itself did not confer directly upon Aguayo a right to be a citizen, it did grant her a right to equal protection of the laws. *See Plyler v. Doe,* 457 U.S. 202, 225 n. 21, 102 S.Ct. 2382, 2399 n. 21, 72 L.Ed.2d 786 (1982) ("Equal Protection clause operates of its own force to protect anyone 'within [the State's] jurisdiction' from the State's arbitrary action"). *Plyler,* in which the Supreme Court held that states may not deny illegal alien children access to public education, demonstrates that the "fundamental" nature of the underlying deprivation is relevant to the standard courts will apply on review. The Court in *Plyler* noted that when a state's action discriminates

against a "suspect class" or burdens a fundamental right guaranteed by the Constitution, the action will be upheld only if it is narrowly tailored to promote a compelling government interest. *Id.* at 216–17, 102 S.Ct. at 2394–95. The *Plyler* Court determined that an illegal alien child's right to a public education was not constitutionally derived but was sufficiently important to warrant an intermediate level of scrutiny for the state's classification. *Id.* at 221–30, 102 S.Ct. at 2396–2401. This opinion will discuss the relevant standard for this case in Part II, *infra.* But in any event, the fact that Aguayo cannot allege a constitutional right to derive citizenship does not defeat her argument that § 1993, by denying her citizenship and granting it to the similarly situated children of citizen fathers, gives her standing to assert a violation of equal protection's command that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920), *quoted in Plyler,* 457 U.S. at 216, 102 S.Ct. at 2394; *see also Heckler v. Mathews,* 465 U.S. 728, 739, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984) ("[T]he right to equal treatment guaranteed by the Constitution is not coextensive with any substantive rights to the benefits denied the party discriminated against.") In the alternative, Aguayo has standing to assert her mother's equal protection right against § 1993's disparate treatment of American citizens on the basis of sex. *See Wauchope,* 985 F.2d at 1411.

### B. Constitutional Standing Limits

 The dispute over constitutional standing in this case focuses on the third element: redressability. The Government contends that Aguayo has no standing because she has not suffered a redressable injury. Her injury is nonredressable, according to the Government, because federal courts are without power to confer citizenship.

The Supreme Court's discussion in *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), lends considerable support to this argument. *Pangilinan* concerned the Nationality Act of 1940, which made citizenship available to aliens who served honorably in the United States Armed

Forces during World War II. The Act authorized designated representatives of the Immigration and Naturalization Service to receive petitions, conduct hearings and grant naturalization outside the United States to qualified alien veterans. *Pangilinan,* 486 U.S. at 878, 108 S.Ct. at 2213. The Act had an expiration date of December 31, 1946. But as World War II wound to a close, the government of the soon-to-be-independent Philippine Islands became concerned about the mass emigration of Filipino veterans. The INS apparently took the position that the Act was discretionary, and not mandatory, concerning the designation of a U.S. official with authority to naturalize alien veterans outside the United States. *Id.* at 880, 108 S.Ct. at 2214. So for a nine-month period from late 1945 to 1946, the INS removed naturalization authority from its vice consul in the Philippines. Nearly 40 years after the expiration date of the Act, 16 Filipino nationals sued the INS in federal court, claiming that the nine-month hiatus violated the Act. Fourteen of the plaintiffs had taken no action to be naturalized before the Act's expiration date. One had taken preliminary steps but had not completed the petition process before the expiration date. Another alleged only that he had inquired at the American embassy before the cutoff date and was told no one there could assist him. The Ninth Circuit held that the INS had violated the Act, and that the naturalization of the 16 Filipino veterans was an appropriate equitable remedy. *Pangilinan v. INS,* 796 F.2d 1091 (9th Cir.1986), *rev'd,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988).

In reversing the Ninth Circuit, the Supreme Court began by noting that the 1940 Act and a subsequent statute expressed the Congress' policy that only aliens who could comply with those statutes were entitled to naturalization. *Pangilinan,* 486 U.S. at 882–83, 108 S.Ct. at 2215. The doctrine of equitable judicial power could not override that public policy. *Id.* at 883, 108 S.Ct. at 2215. The Court then stated:

> More fundamentally, however, the power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally equitable

powers. See, *e.g.,* 28 U.S.C. § 1361; 28 U.S.C. § 1651. Rather, it has been given them as a specific function to be performed in strict compliance with the terms of an authorizing statute which says that "[a] person may be naturalized ... in the manner and under the conditions prescribed in this subchapter, *and not otherwise.*" 8 U.S.C. § 1421(d) (emphasis added).

> "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." *United States v. Ginsberg,* 243 U.S. 472, 474, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917).

Or as we have more recently said: " 'Once it has been determined that a person does not qualify for citizenship ... the district court has no discretion to ignore the defect and grant citizenship.' " *Fedorenko v. United States,* 449 U.S. 490, 517, 101 S.Ct. 737, 752, 66 L.Ed.2d 686 (1981) (citation omitted).

*Pangilinan,* 486 U.S. at 883–84, 108 S.Ct. at 2215–16. The Court then reiterated its analysis of the statutory scheme effectively denying naturalization to Filipino veterans who had missed the cutoff date of the 1940 Act, concluding that "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.* at 884–85, 108 S.Ct. at 2216–17. Finally, the Court rejected the veterans' claims that the INS had deprived them of constitutional rights when it revoked the vice consul's authority to receive naturalization petitions in the Philippines for nine months. *Id.* at 885–86, 108 S.Ct. at 2217.

The Government reads *Pangilinan* as barring federal courts from granting equitable relief in any naturalization case, no matter whether plaintiff's lack of citizenship is the result of a constitutional or statutory violation. Plaintiff relies on *Wauchope,* in which

the Ninth Circuit interpreted *Pangilinan* as applying only to circumstances in which an alien was denied citizenship by virtue of the Government's violation of a statute that, had it been followed, would have entitled the plaintiff to citizenship. *Wauchope*, 985 F.2d at 1418. *Pangilinan* "does not speak to the courts' capacity to utilize traditional constitutional remedies to rectify *constitutional* violations." *Id.* (emphasis in original).

These traditional constitutional remedies, according to the *Wauchope* court, had their roots in cases such as *Heckler v. Mathews*, 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984). In *Heckler*, a plaintiff challenged a "pension offset" provision of the 1977 Amendments to the Social Security Act. The provision reduced the spousal benefits of nondependent men by the amount of pension payments the men were receiving, but it excepted nondependent women from this offset. *Id.* at 735, 104 S.Ct. at 1393. The Court held that for purposes of constitutional standing, the plaintiff's injury was redressable because a court could issue an order wiping out the exception, effectively withdrawing the benefits from the class favored by the statute (the nondependent women). *Id.* at 740, 104 S.Ct. at 1395. The Supreme Court in *Heckler* stated that courts can remedy constitutionally underinclusive statutory schemes by either withdrawing the benefit from the favored class or by extending the statute's benefits to the excluded class. *Id.* at 738, 104 S.Ct. at 1394. In this case, Aguayo argues that her injury is redressable because under *Heckler*, a court could extend § 1993's benefits to the statute's excluded class by granting her citizenship.[1]

Aguayo's reliance on *Heckler* focuses on what the Court said in that case, rather than on what the Court did. The statute containing the pension offset contained a clause specifically stating that if the statute were held invalid as to some persons, it would be rendered invalid as to all. *Heckler*, 465 U.S. at 734, 104 S.Ct. at 1392. By withdrawing the statute's benefits from the favored class, the Court did exactly what the Congress envisioned in the invalidating clause. Here, Aguayo asks this court to go farther. She points to no congressional enactment or constitutional provision that specifically authorizes the court to extend § 1993's benefit— the status of U.S. citizenship—to the class of persons excluded by the statute.[2] Moreover, in matters of immigration, naturalization and alienage, courts have repeatedly stated that their duty is "rigidly to enforce the legislative will." *Pangilinan*, 486 U.S. at 884, 108 S.Ct. at 2216.

Despite the language of *Pangilinan*, this court agrees with Aguayo that there are limits to the courts' obligation to "rigidly ... enforce the legislative will," even in immigration or naturalization cases. Those limits may be found in the Constitution, and in federal courts' power of judicial review of legislative enactments. The Constitution defines a citizen as one who is either "born or naturalized" in the United States. U.S. Const. amend. XIV. It further provides that Congress determines who may be naturalized. U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power ... [t]o establish an uniform Rule of Naturalization...."). But the Constitution also grants every person within the jurisdiction[3] a right to equal protection of the laws. U.S. Const., amend. XIV; *see also Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (noting equal protection component of federal government's obligation to observe due process under Fifth Amendment). The Constitution does not give Congress the power, in the naturalization context or elsewhere, to pass laws that violate other substantive provisions of the Constitution.

1. Aguayo does not argue that the proper remedy is to withdraw the benefit § 1993 conferred on the favored class, and the court agrees that to do so would be to denaturalize those who, as foreign-born children of citizen fathers, availed themselves of § 1993 and became citizens.

2. Aguayo, in her complaint, cites 8 U.S.C. § 1503 as one of the sources of the court's jurisdiction. Although Aguayo does not argue in her briefs that § 1503(a) provides a remedy, the court will discuss its applicability later in this opinion in Part IV, *infra*.

3. Aliens who are territorially present in the jurisdiction are considered "persons" protected by Fifth and Fourteenth Amendment due process. *Plyler v. Doe*, 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982).

Citing 8 U.S.C. § 1421(d), the *Pangilinan* court used the words "nor by any other means" to state that courts may not confer citizenship "in violation of these limitations." *Pangilinan*, 486 U.S. at 885, 108 S.Ct. at 2217. But the decision in *Pangilinan* obviously did not consider the scope of the courts' power to fashion a remedy for a statutory scheme that is constitutionally underinclusive. To the contrary, the Court in *Pangilinan* specifically held that no constitutional violation had taken place in that case. *Id.* at 885–86, 108 S.Ct. at 2217. That is an important factor distinguishing *Pangilinan* from this case, because one of the oldest principles of constitutional law holds that the judiciary's powers are qualitatively different when a controversy requires a judge to interpret and give effect to the Constitution. Courts do not allow "statutory limitations" to block the enforcement of the Constitution. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). In *Marbury*, Chief Justice Marshall wrote:

> Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law. This doctrine would subvert the very foundation of all written constitutions. It would declare an act which, according to principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual.

*Id.* at 178. This passage from *Marbury* demonstrates why the *Heckler* Court's discussion of the scope of the equitable remedy for constitutional violations is more than empty language. Quoting Justice Brandeis, the *Heckler* Court explained that "when the 'right invoked is that to equal treatment,' the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler*, 465 U.S. at 740, 104 S.Ct. at 1395 (emphasis in original) (quoting *Iowa–Des Moines Nat'l Bank v.*

*Bennett*, 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265 (1931)).

Federal court power to fashion remedies for constitutional violations is well-established in the Supreme Court's jurisprudence of individual rights and equal protection. Where there was no statutory cause of action for Fourth Amendment violations by federal officers, the Supreme Court held that persons alleging such violations could resort to a private lawsuit and damages remedy. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971) (citing *Marbury*, 5 U.S. (1 Cranch) at 163). The Court extended the *Bivens*-type remedy to Fifth Amendment equal protection claims in *Davis v. Passman*, 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979), in which the Court stated that "[t]he Constitution does not 'partake of the prolixity of a legal code.' It speaks instead with a majestic simplicity. One of its 'important outlines' is the designation of rights. And in 'its great outlines,' the judiciary is clearly discernible as the primary means through which these rights may be enforced." *Id.* at 241, 99 S.Ct. at 2274 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819)). In *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Court spoke of the scope of a district court's equitable power to remedy constitutional violations as "broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 15, 91 S.Ct. at 1275. The defendant state school officials in *Swann* argued that federal courts could not force them to desegregate their schools through busing, citing a federal statute that specifically stated it did not empower federal courts to order forced busing. *Id.* at 17, 91 S.Ct. at 1276. But the statute also stated it did not diminish the court's existing powers, which the Supreme Court held to include the power to order forced busing as a means of correcting the unconstitutional condition of segregation. *Id.* at 16, 29–31, 91 S.Ct. at 1276, 1282–83. Cases such as *Bivens*, *Davis* and *Swann* show that courts do not need specific congressional authorization

to employ a remedy, at law or in equity, that is tailored to correct a constitutional wrong.

The Government also does not contend that Congress, in circumscribing the means by which persons may be naturalized, see 8 U.S.C. § 1421(d), clearly intended to foreclose judicial review of constitutional questions that may arise within the statutory naturalization scheme. To accept the Government's interpretation of the *Pangilinan* decision and hold that there is no remedy for a constitutional violation that results in a denial of citizenship would be to give § 1421(d) an unnecessarily expansive reading. Absent the necessary clear and convincing evidence that Congress intended to restrict judicial review of constitutional questions pertaining to immigration, naturalization and alienage, see *Johnson v. Robison,* 415 U.S. 361, 373, 94 S.Ct. 1160, 1168, 39 L.Ed.2d 389 (1974), this court is not prepared to hold that there is absolutely no remedy for Aguayo's injury, where to do so would be to permit the invidious discrimination of § 1993.

This court holds that such a remedy exists and is available to Aguayo if she is able to demonstrate the facial unconstitutionality of § 1993. *Pangilinan* limited only the district court's asserted "power to make someone a citizen of the United States." *Pangilinan,* 486 U.S. at 883, 108 S.Ct. at 2215; *In re Thornburgh,* 869 F.2d 1503, 1517 (D.C.Cir. 1989). As this opinion has discussed, that limitation was not specifically extended to circumstances involving constitutional violations. *Pangilinan* did not say that federal courts cannot fashion a remedy for a constitutionally underinclusive naturalization law by invoking their statutorily enumerated powers, see 28 U.S.C. §§ 1361, 1651;[4] or their judicially created equitable powers, *Heckler,* 465 U.S. at 740, 104 S.Ct. at 1395; or the powers afforded by 8 U.S.C. § 1503(a) in conjunction with 28 U.S.C. § 2201. Aguayo's injury is redressable, and she has standing to bring her constitutional challenge to § 1993.

## II. The Unconstitutionality of § 1993

Section 1993, on its face, makes citizenship available to the foreign-born children of citizen fathers, but not to those of citizen mothers. The parties agree the standard under which this court should review the constitutionality of § 1993 is as stated in *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). Under that standard, the Government argues that § 1993 must be upheld if Congress had a "facially legitimate and bona fide reason" for the gender classification. *Id.* at 794–95, 97 S.Ct. at 1479.

First, a word about the appropriate standard is in order. To the extent that Aguayo brings this lawsuit to assert the equal protection rights of her mother, Section 1993 contains a gender-based classification. Ordinarily, gender-based classifications are reviewed under so-called "heightened" or "intermediate" scrutiny, in which the classification is upheld only if it is substantially related to the achievement of important governmental objectives. See *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). To the extent this suit asserts Aguayo's own equal protection rights against § 1993's classification among the foreign-born children of American citizens, the court notes that the same standard of "heightened" or "intermediate" scrutiny also was applied to the state's classification among children in *Plyler,* 457 U.S. at 230, 102 S.Ct. at 2401. But where immigration or naturalization is concerned, the Supreme Court has employed a far more deferential standard of review. See *Mathews v. Diaz,* 426 U.S. 67, 79–80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.") The applicable standard in these cases resembles the political question doctrine, *id.* at 81–82, 96 S.Ct. at 1892, insofar as it calls

---

4. Section 1361 provides: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Section 1651 provides: "(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law. (b) An alternative writ or rule nisi may be issued by a justice or a judge of a court which has jurisdiction."

upon courts to defer to the broad policy choices of Congress, even where constitutional interests are implicated, so long as those policy choices are based on a "facially legitimate and bona fide reason." *Fiallo*, 430 U.S. at 794–95, 97 S.Ct. at 1479.[5]

■ The Government contends that the legitimate and bona fide reason for § 1993 lay in the legislature's intent to reduce the incidence of dual citizenship:

> Most of the world in the 19th and early 20th centuries regarded the children of mixed-citizen marriages as obtaining the citizenship of the father, and did not confer citizenship *jus soli* (by birth on the nation's soil) on the child in a mixed-citizenship marriage. Therefore, to reduce the incidence of dual nationality, it was necessary to allow only one parent, the father, to transmit citizenship by descent. This was also done to harmonize the nationality law of the United States with the nationality law of the other nations of the world at that time. Congress thus did not act arbitrarily in allowing only fathers to transmit their citizenship to their foreign-born offspring of an alien spouse. Rather, Congress made a rational judgment against the backdrop of, and in harmony with, the prevailing international custom of the time relating to nationality and citizenship.

Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, at 8. The Supreme Court has held that the legitimacy of Congress' concern about the proliferation of dual citizenship cannot be questioned. *Rogers v. Bellei*, 401 U.S. 815, 831–32, 91 S.Ct. 1060, 1069, 28 L.Ed.2d 499 (1971). But that concern on the part of Congress cannot be a "bona fide" reason if it could not reasonably have been a goal of the legislation. *Wauchope v. United States Dep't of State*, 985 F.2d 1407, 1415 (9th Cir.1993) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975)).

To accept the Government's above-quoted argument, the court would have to accept that under the laws of most nations around the time of § 1993's enactment, a child born abroad of a U.S. citizen father and alien mother would not be recognized as a citizen of his mother's homeland. If, as the Government contends, most nations followed the principle of *jus sanguinis*, in which citizenship passes by only the father's bloodline and not by birth on a nation's soil, these children would not create a dual citizenship problem because the countries of their birth would consider them U.S. citizens. Therefore, § 1993 would harmonize U.S. law with international law by simply recognizing these foreign-born children of U.S. citizen fathers as U.S. citizens as well. According to the Government's argument, extending U.S. citizenship to the foreign-born children of citizen mothers (and alien fathers) posed a real threat of aggravating dual citizenship problems. If the principle of *jus sanguinis* were dominant around the world, foreign nations would recognize these children of U.S. citizen mothers as citizens of their father's homeland; to extend § 1993 to grant U.S. citizenship to these children would be to create a large number of dual citizens.

This argument comports with common sense and reason, and it would be a bona fide reason for § 1993 if its premise were correct. The Government's brief, however, was notably lacking in citation to authority on the question of whether *jus soli* or *jus sanguinis* was the dominant feature of most nations' citizenship laws at the turn of the century. The district and appellate courts in *Wauchope* appear to have researched this question. "At the time that Section 1993 was in effect, a significant number of countries provided that individuals born on their soil acquired their citizenship." *Wauchope*, 985 F.2d at 1415. This court independently examined the sources cited in *Wauchope* and

---

**5.** Because Aguayo does not argue for application of heightened or intermediate scrutiny, the court will forego a detailed discussion of why that more stringent standard does not apply. The Supreme Court's discussion in *Plyler* appears to support the application of heightened scrutiny to statutory discrimination against aliens by states, which do not have broad powers over immigration and naturalization, but not to discriminatory measures taken by Congress pursuant to those broad powers. *Plyler*, 457 U.S. at 225, 102 S.Ct. at 2398.

reached the same conclusion.[6] Although some countries did not recognize as citizens the native-born children of an alien father and citizen mother, a significant majority of nations did confer citizenship or make it available, in one form or another, to all native-born children of mixed-citizen marriages. In these latter foreign countries, native-born children of U.S. citizen fathers either were or could become citizens of their countries of birth.

> Because a significant majority of countries adhered to some gender-neutral version of *jus soli*, a sizeable proportion of children born abroad acquired the citizenship of a foreign country. By also deeming those children United States citizens where their fathers were American, Section 1993 inevitably gave rise to numerous instances of dual citizenship.... Avoiding the problems of dual nationality thus cannot reasonably be posited as a basis for Section 1993's distinction between the ability of American citizen mothers and fathers to transmit citizenship to their foreign-born offspring.

*Wauchope,* 985 F.2d at 1416.

This court agrees that if the foreign-born children of U.S. citizen fathers could become citizens of their countries of birth, the Government's asserted rationale for § 1993 breaks down. The Government also is not helped by the fact that Congress amended the law in 1934 to allow foreign-born children of citizen mothers to derive citizenship as well. *See* 8 U.S.C. § 1401(g). As an aside, the court notes that in the late 19th and early 20th centuries, the law did not exactly con-

sider men and women to be on the same legal plane. In 1872, just two years before § 1993 was enacted, the Supreme Court held that Myra Bradwell could properly be denied a law license on account of her sex. *See Bradwell v. Illinois,* 83 U.S. (16 Wall.) 130, 141, 21 L.Ed. 442 (1872) (Bradley, J., concurring) ("[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life.... The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator."). *See also Elias v. United States Dep't of State,* 721 F.Supp. 243, 249 (N.D.Cal. 1989) (stating that Government had offered no bona fide reason for § 1993's gender classification, "[n]or can we imagine one other than the Congress of that day simply assumed that women as the chattels of their husbands should not be entitled to transmit their United States citizenship to their foreign-born offspring. This is obviously neither legitimate nor bona fide.")

In this case, the court holds simply that the Government has not advanced a legitimate and bona fide reason for the gender-based classification created by § 1993. The law therefore fails the deferential test of *Fiallo v. Bell,* and the court holds that the law violates the constitutional guarantee of equal protection by creating an impermissi-

---

**6.** A compilation of international citizenship law in the late 19th and early 20th centuries is contained in *A Collection of Nationality Laws of Various Countries,* a 1929 book edited by Richard W. Flournoy, Jr. and Manley O. Hudson. The book includes the laws of approximately 77 nations or their colonies, dominions and protectorates. Of these, approximately 50 operated on a principle of *jus soli,* some limited variant of that rule, or a form of *jus sanguinis* in which citizenship passed from either the mother or the father. For example, countries such as Russia, Sweden, Turkey, and Costa Rica allowed children born in their countries of a citizen mother and alien father to become citizens upon satisfying certain conditions, such as having residency in the country, attaining the age of majority, and registering or declaring an intent to become a citizen. Na-

tions applying *jus soli* in a virtually unlimited fashion, holding that any persons born on their soil were citizens, no matter the citizenship of the parents, included the British Empire (including Ireland, India, Canada, Australia and New Zealand) France, Spain, Bulgaria, and a number of Central and South American countries (Argentina, Bolivia, Brazil, Chile, Colombia, the Dominican Republic, Ecuador, Guatemala, Honduras, Nicaragua, Panama, Paraguay, Peru, El Salvador, Uruguay and Venezuela). About 23 countries adhered to *jus sanguinis.* The most notable among these included China, Japan, Germany, Greece and Poland. Italy moved from *jus sanguinis* to a limited form of *jus soli* in 1912, and Mexico did the same in 1917. Lithuania and Ethiopia did not have clear laws on the subject.

ble gender-based classification that unlawfully discriminates against Aguayo and others in the disfavored class, whose only misfortune under the statute was to be born of citizen mothers instead of citizen fathers.

### III. Laches

The Government raises the equitable defense of laches, arguing that plaintiff's unreasonable delay in bringing her claim prejudiced the Government's interests. As an equitable doctrine, laches is principally concerned with the fairness of permitting a claim to be enforced, and it is based not simply on the passage of time, but on changes of conditions or relationships involved with the claim. *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir.1988). Laches consists of two elements: (1) a lack of diligence by the plaintiff, and (2) prejudice resulting from the delay. *Id.* The plaintiff bears the burden of explaining the delay in bringing suit. *Id.*

Aguayo was born in 1926 and has lived in the United States since 1962, yet she did not file this action until 1992. To explain the delay, she states that she did not know of her potential claim to citizenship until consulting with an attorney in 1990 about an unrelated matter. Plaintiff cites *Wauchope,* in which the Ninth Circuit held that plaintiffs' long delays in bringing suit were not unreasonable because no court had found § 1993 to be unconstitutional until 1989. *Wauchope,* 985 F.2d at 1411. A similar argument could be made in this case. Aguayo does not plead that she delayed out of ignorance of a legal cause of action that clearly existed during the time in which she delayed. Although she could have raised a constitutional challenge to § 1993 at any time in her life, only recently could she reasonably believe that such a challenge would have any chance of success. Prior to *Wauchope* and the district court decision it affirmed, a reasonable plaintiff in Aguayo's position would be justified in assuming that under *Montana v. Kennedy,* she had no claim to citizenship as a matter of statutory construction.

The court notes that the application of the doctrine of laches is within its equitable discretion. *Leonard v. United Air Lines, Inc.,* 972 F.2d 155, 158 (7th Cir.1992) (citing *Lingenfelter v. Keystone Consol. Indus., Inc.,* 691 F.2d 339, 341 (7th Cir.1982)). The doctrine also is intended to be flexible and depends on the peculiar equitable circumstances of each case. *Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987) (citing *The Key City,* 81 U.S. (14 Wall.) 653, 660, 20 L.Ed. 896 (1871)). With these principles in mind, the court declines to hold that Aguayo's delay in this case is unreasonable or evidences a lack of diligence. Litigants are expected to know the law, but their failure to anticipate or create new legal developments should not be held against them by application of the doctrine of laches.

The lack of an unreasonable delay makes a prejudice analysis largely unnecessary, although even if the delay here were not excused, the Government would have difficulty showing prejudice. The sort of prejudice contemplated by laches typically stems from a loss of evidence that diminishes the defendant's chance of success at trial, *Zelazny,* 853 F.2d at 543, or from changed circumstances such as a marked decrease or increase in the value of property that is a subject of the litigation. *Lake Caryonah Improvement Ass'n v. Pulte Home Corp.,* 903 F.2d 505, 510 (7th Cir.1990). Although administrative convenience may also be considered in weighing the prejudice prong of the laches analysis, *Zelazny,* 853 F.2d at 543, the Government does not advance a persuasive argument as to why it is prejudiced by the delay. The Government argues instead that it would be prejudiced from the consequences of a decision favorable to Aguayo. But those consequences are no different now than they were when Aguayo emigrated to the United States in 1962, which was 28 years after Congress amended § 1993 prospectively to make citizenship available to the foreign-born children of citizen mothers.

### IV. Relief

With no genuine dispute as to the facts, and with the court having decided that on these facts, Aguayo is entitled to relief as a matter of law, the court will enter summary judgment in Aguayo's favor. As to the question of appropriate relief, Aguayo seeks a

declaration that § 1993 is unconstitutional and that she is a citizen of the United States.

As the court stated earlier in this opinion, authority for such a remedy lies in a number of sources. The court may issue a writ of mandamus, ordering the Attorney General of the United States to make Aguayo a citizen. *See* 28 U.S.C. §§ 1361, 1651. The court may invoke its traditional equitable power to remedy constitutional violations. *Heckler,* 465 U.S. at 740, 104 S.Ct. at 1395. Or, the court may simply issue a declaratory judgment to the effect that Aguayo is a citizen of the United States. 8 U.S.C. § 1503(a); 28 U.S.C. § 2201. Although the parties have not briefed the applicability of § 1503(a), it appears to be the clearest authority for the sort of relief Aguayo seeks. Section § 1503(a) provides in relevant part:

> If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28 [allowing suits for declaratory judgment] against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case of the issue of such person's status as a national of the United States (1) arose by reason of, or in connection with any exclusion proceeding under the provisions of this chapter or any other act, or (2) is in issue in any such exclusion proceeding.

8 U.S.C. § 1503(a). Aguayo sued the Secretary of State upon his action denying her a passport on the ground that she is not a U.S. citizen under § 1993. Certified Administrative Record at 4. Her lawsuit does not arise out of any exclusion proceeding. The court has determined that § 1993 is unconstitutional, and that the proper remedy is to issue a declaratory judgment declaring Aguayo a citizen. The court will issue that declaratory judgment, pursuant to 28 U.S.C. § 2201 and 8 U.S.C. § 1503(a). *See also Wauchope,* 985

F.2d at 1418 (affirming district court's declaration that plaintiffs were citizens).

Aguayo also prays for attorneys' fees and costs. But she does not present any statutory authority or argument as to why she should receive such an award. If Aguayo still wishes to press her argument for an award of fees and costs, she may submit a memorandum of law to the court by October 14, 1994. If she files such a memorandum, the Government may have until November 4, 1994, to file a written response.

## CONCLUSION

For the foregoing reasons, the court grants plaintiff Aguayo's motion for summary judgment and denies the Government's motion. Aguayo is declared to be a citizen of the United States.